### LITTELL v. HACKLEY et al.

(Circuit Court of Appeals, Sixth Circuit. November 3, 1903.)

No. 1,193.

1. LEGACY—EXPENDITURE FOR LEGATEE'S EDUCATION—SUBSEQUENT RECOVERY.
Where an executor expends the greater part of a legacy, payable when the legatee should become of age, for the legatee's support and education, turning over the balance to her after her marriage, and about the time she becomes of age, the legatee cannot, more than 12 years afterwards, have the estate opened up for the purpose of compelling payment of the legacy a second time.

2. ADMINISTRATION OF DECEDENT'S ESTATE—PURCHASE BY EXECUTOR—VALIDITY.
Where an executor, who is also a surviving partner in a firm in course of liquidation, explains to the sole legatee of the deceased partner the desirability of her disposing of her interest in the remnants of the firm property, and offers to purchase the same at a price to be fixed by a business man of experience and standing to be selected by her, and she approves of the suggestion, and selects a business man to act for her, and the executor buys the legatee's interest at an adequate price fixed by such business man, the sale will not, 12 years later, be set aside upon her application, though, for the purpose of perfecting the title, the executor, as such, conveys to his copartner, who reconveys to him individually.

3. SAME—EXECUTOR'S COMPENSATION—ALLOWANCE OF EXTRA FEES.

Where an executor, having rendered extraordinary services in the conduct of litigation for the estate and for its legatee, arranges with the legatee for extra compensation, one-half of which is to be paid to a relative of decedent who has received nothing under the will, which arrangement is carried out, and the executor's final account approved by the legatee, she cannot, 12 years later, object to such extra compensation.

4. SAME—FINAL ACCOUNT—FAILURE TO FILE.

Where an executor and the sole legatee of an estate presented to the probate court an affidavit showing the complete settlement of the estate, and reciting a discharge of the executor by the legatee, and the executor's final account is indorsed with a release by the legatee, the fact that the final account then presented to the court was not filed, but was retained by the executor, is immaterial.

Appeal from the Circuit Court of the United States for the Western District of Michigan.

Stephen H. Clink, for appellant.

Jacob Kleinhans and Willard Kingsley, for appellees.

Before LURTON, SEVERENS, and RICHARDS, Circuit Judges.

RICHARDS, Circuit Judge. This was a bill in equity, filed by the appellant (complainant below) against the appellees, charging them with fraud in winding up a partnership and administering an estate, and praying that certain conveyances be set aside and an accounting had. To the bill, answers were filed, proof taken, and the case submitted to the Circuit Court, which found against the complainant and dismissed the bill. From this decree an appeal has been taken.

At the time of his death, on June 21, 1884, Porter Hackley was a member of the lumber manufacturing firm of C. H. Hackley & Co., of Muskegon, Mich., composed of Charles H. Hackley, owner of a one-half interest, and Thomas Hume and Porter Hackley, each the owner of a one-fourth interest. The firm was formed June 25, 1881, under articles which recited that the capital stock at that time consisted of lands, lumber, and property amounting to $260,000, of which Charles H. Hackley had contributed $130,000, and Thomas Hume and Porter Hackley each $65,000. It was provided that the partners should give their personal attention to the business, with this reservation that "said Charles H. Hackley and Thomas Hume shall be at liberty to give such time and attention as may be needed to the business of Hackley & Hume, of which last-named firm they are members." Books of account were to be kept, and an inventory and division of profits made annually at the close of the sawing season. In the event of the death of any one of the partners, the firm was not to be dissolved, but might be continued by the surviving partners "for a period not exceeding five years from said death," in order to wind up its affairs without loss. To make this provision effective, each of the partners, at the time the firm was formed, made his will, containing a similar provision. The will of Porter Hackley, out of the administration of which this suit arose, appointed his brother, Charles H. Hackley, executor, provided for the turning of his interest in the firm into money in accordance with the terms of the articles, and bequeathed "all money which shall be realized from

the conversion of my property into money as herein provided" (obviously referring to his interest in the firm), and all the rest and residue of his property, to his niece Nellie A. Hackley, the appellant. Power was given the executor to sell and convey any of his lands or other property, whether held in severalty or in copartnership. Charles H. Hackley accepted the office of executor, filed an inventory showing that Porter's property, in addition to a watch and chain, consisted solely of his interest in the firm, which was then worth about $125,000, administered the estate, turning the partnership interest into money, and paying the same, after settling the expenses of administration, to the legatee, or for her use, and on February 11, 1887, upon presenting a final account of all receipts and disbursements, indorsed as correct by the legatee, with a final receipt and release, was discharged by the court of probate at Muskegon from all liabilities growing out of the administration. On November 3, 1899, more than 12 years after the discharge of the executor, the complainant filed her bill, in which she charged her uncle Charles H. Hackley and his partner, Thomas Hume, not only with fraud in winding up the affairs of C. H. Hackley & Co., and in administering the estate of Porter Hackley, but also with fraud in the settlement of other copartnerships of which Charles H. Hackley was a member, and of which she alleged her uncle Porter Hackley, her father, Edwin Hackley, and her grandfather. Joseph H. Hackley, one or all, were members. There were the firms of J. H. Hackley & Co., Hackley & Sons, Hackley & McGordon, and Hackley & Hume, which will be referred to hereafter. There are a great many charges of fraud. The bill is fairly choked with them. We have gone over them all in the light of the record, but, of necessity, shall confine ourselves, in the opinion, to the examination of those which seem to merit discussion.

1. There is no testimony to sustain the charge that either the complainant or her father, Edwin, or her uncle Porter, or herself, acquired any interest in the estate of her grandfather Joseph H. Hackley, which was not fully accounted for in its administration. Joseph H. Hackley at the time of his death, January 8, 1874, owned a one-fourth interest in the firm of Hackley & Sons; the other members being Porter, who owned one-fourth, and Charles H., who owned one-half. He died leaving an estate of about $54,000. By his will he gave his son Edwin $200, his granddaughter Nellie, the complainant, $5,000, when she should arrive at the age of 21 years, and the residue to his widow, Catherine, and his sons Charles H. and Porter. In 1875 Charles H. bought the shares of the widow, Catherine, and his brother Porter, in the estate. He was one of the executors, and says he expended the greater part of Nellie's legacy for her support and education, turning over the balance to her, after her marriage, and about the time she became of age. The bill (paragraph 5) states that the legacy was used to pay the expenses of her education. Since she received the full benefit of the only interest she had in her grandfather's estate, she cannot seriously expect the court to open up that estate now for the sole purpose of compelling the payment of her legacy a second time, especially in view of her long

acquiescence, since she became of age, in the mode of settlement of her interest.

2. The bill contains the claim that her father, Edwin Hackley, left a large estate, consisting of interests in the firms of Hackley & Sons and Hackley & McGordon, which was never administered, but fraudulently appropriated by his brother Charles H. The proof shows conclusively that Edwin Hackley had no estate at the time of his death. He never had any interest in the firm of Hackley & McGordon. He did have an interest at one time in the firm of Hackley & Sons, but he sold this in 1872 to his brother Charles H., went to Indiana, where he lost the money, and, returning to Muskegon, died there in 1875, penniless. His funeral expenses and board bills were paid by his brothers Charles H. and Porter.

3. The charge that Porter had an interest at the time of his death in the firms of Hackley & McGordon and Hackley & Hume finds no support whatever in the testimony. The firm of Hackley & Hume was the successor of the firm of Hackley & McGordon. Thomas Hume in 1881 bought the interest of the estate of James McGordon in the firm of Hackley & McGordon, and the firm of Hackley & Hume was formed, in which Charles H. Hackley owned three-fourths, and Thomas Hume one-fourth, interest. The only property which Porter owned when he died was a one-fourth interest in the firm of C. H. Hackley & Co.

4. It is charged further that the inventory filed by Charles H. Hackley, as executor, on July 1, 1885, was false and fraudulent, and made for the purpose of deceiving the complainant. This inventory stated that the property of Porter Hackley at the time of his death consisted exclusively, except a gold watch and chain, of his interest in the firm property of C. H. Hackley & Co., of which he owned one-fourth; that the inventory of the firm property was as it existed on December 31, 1884, that being the date when the last firm inventory was made. Necessarily there were changes required because of the conversion in the interim of part of this property into money. According to the inventory, the executor then had in his hands, as cash drawn from the firm, $107,850.15, being Porter's share of the divisible assets, while the assets not yet reduced to cash, consisting of the sawmill plant and appurtenances, accounts and bills receivable, logs and lumber, etc., were of the value of $69,538.89. In support of the charge of fraud, the complainant relies upon the fact that when an inventory was made of the estate of James McGordon, in 1881 (McGordon having been a member of the firm of C. H. Hackley & Co.), substantially the same items of firm property were appraised at a much higher figure. But this depreciation between 1881 and 1885 was the inevitable result not only of the natural wear and tear incident to use, but of a shrinkage in the value of all sawmill property in that part of Michigan, owing to the rapid exhaustion of the local timber supply. The testimony wholly fails to support the charge that there was any willful undervaluation of the assets of the firm in the inventory.

5. The articles of copartnership of C. H. Hackley & Co. provided that the firm might be dissolved if one of the partners should use

intoxicating liquors as a beverage. The testimony shows that Porter was using liquor to excess just prior to his death. Indeed, the record shows he died from delirium tremens, and at the house of a disreputable woman with whom he was then cohabiting. Whether because of his intemperate habits, or by reason of the condition of the timber supply, it is clear that before his death the affairs of the firm had been placed in course of liquidation. The last of the timber on the Clare county lands—the only timber land in Michigan owned by the firm—was cut during the winter of 1882 and 1883. On January 1, 1883, the firm had on hand over 23,000,000 feet of logs. In the year 1883 it manufactured into lumber over 16,000,000 feet of this, leaving on hand January 1, 1884, about 7,000,000 feet. 1,500,000 feet of this were in the company's boom at Muskegon. The other 5,500,000 were in the Muskegon river. By December 31, 1884, the firm had received almost the entire balance of the 5,500,000 feet, the estimated amount of logs remaining in the river at that time being only 50,000 feet. No new logs were acquired after the 1st of January, 1884; the firm having no timber land of its own, and purchasing no logs from other parties after this date. It thus appears that from December 31, 1883, to December 31, 1884, nearly all the saw logs and lumber had been sold and converted into money. The share of these divisible funds belonging to the estate of Porter Hackley was $107,850.15, which was paid to his executor.

The inventory of December 31, 1883, and trial balance of January 1, 1884, show the condition of the firm six months before Porter Hackley died, and confirm the conclusion that it was then, as before stated, in process of liquidation. The firm at that time had bills receivable to the amount of $124,334.67; Hackley & Hume owed it $87,238.42, a quick asset; it had on deposit in the Muskegon National Bank $100,822.06; and owned logs and lumber of the value of about $110,000—altogether, about $422,000 of assets readily convertible into cash, and it owed only $2,000. By the spring of 1886 all the property of the firm had been converted into money, except the mill, schooner, storeroom, and small items of personal property. The firm had no pine lands, timber, logs, or lumber left. It became a question as to what should be done with the remnants of the property. Three-fourths of it was owned by Charles H. Hackley and Thomas Hume, who also composed the firm of Hackley & Hume, which had purchased and owned timber land in Michigan and elsewhere. Indeed, that firm had devoted itself especially to the purchase of timber land. Under the will of Porter Hackley, it was necessary to turn the remnants of the firm property into money, since the business of the concern had practically been wound up, and nothing but the plant remained. The natural purchasers of this property were the remaining partners. Indeed, the articles of copartnership provided that, upon the dissolution of the firm because of the use of intoxicating liquors by a member, the remaining partners should have the right to purchase the interest of the retiring partner at a value to be fixed by appraisers. Accordingly Charles H. Hackley explained to his niece Nellie the situation; told her that there was no timber belonging to the mill, that saw bills were decreasing, that sawmill

property was depreciating and was hazardous on account of fires, and that he thought it would be better for her to sell her interest in the sawmill property and invest her money, which would practically close the estate. At that time she was in her twenty-fourth year, married, with one child, not lacking intelligence, and quite capable of understanding business transactions. She agreed with her uncle that her remaining interest should be sold, and he agreed to buy it, but, in order that there might be no question as to the fairness of the price paid, suggested that she get some business man of standing to represent her, inspect the property, and put a valuation on it; and she selected Thomas Monroe, an old and experienced lumberman, the superintendent of the Thayer Lumber Company. Monroe testified that the complainant came to him and requested him to act as appraiser for her, stating that she desired to sell out, and that her uncle Charley had said that she must get somebody to act for her in the appraisement. At the same time she gave the reasons why she thought it best to sell out. Monroe examined the trial balance, went through a list of the property, and appraised it at what he considered a fair cash value. Under this appraisement, $12,000 was the price to be paid for Nellie's interest. Deeds and a bill of sale to carry out the agreement were executed by Nellie in Chicago. Her uncle Charley was not there at the time. The deeds and bill of sale were sent to Benjamin F. Deming, who read them over to her. There is no doubt she understood perfectly what she was doing. Mrs. Lee, a friend of hers, in Chicago with her, testified that Nellie told her what she was going to do, and gave the reasons.

The overwhelming weight of the testimony was to the effect that the appraisement made by Thomas Monroe, and the price paid by Charles H. Hackley, was all, if not more than, the property was worth. Seven witnesses—the leading sawmill men of Muskegon—were put on the stand, and confirmed the fairness of the appraisement, giving prices, paid at other sales of similar property about that time in support of their views. The purchase price of $12,000 was paid to Charles H. Hackley, executor, and accounted for by him in his final account. The beneficial interest having thus been conveyed to Charles H. Hackley by his niece, the sole legatee, in order to perfect the legal title Charles H. Hackley, as executor, conveyed the property by two deeds and a bill of sale to Thomas Hume, who conveyed it back to Charles H. Hackley. The consideration recited in these instruments was the same as that in the deeds and bill of sale from Nellie to Charles H. Hackley; but it was only nominal, there being in fact no consideration paid as between C. H. Hackley and Thomas Hume.

If Charles H. Hackley, acting as executor, had sold the property of his niece to Thomas Hume, and Hume afterwards reconveyed it to him, without the knowledge or approval of his niece, and for the purpose of acquiring the property for less money than it was worth, a case would be presented for the application of the rule laid down in Michoud v. Girod, 4 How. 503, 11 L. Ed. 1076. A person cannot purchase legally on his own account that which his duty or trust requires him to sell for another, nor purchase on account of another

that which he sells on his own account. But that is not this case. Charles H. Hackley did not purchase as an individual, "per interpositam personam," what he sold as executor. The arrangement for the purchase was made with his niece. The matter was fully explained to her. In order that he might not be placed in the inconsistent positions of being at the same time seller and buyer, where his duty as executor would clash with his interest as an individual, he requested his niece to select a business man of experience to represent her and appraise the property which she was willing to sell and he to buy. This she did, and a fair valuation was placed upon the property, as the testimony shows. She voluntarily executed deeds to carry out the agreement, and, in view of the time which has elapsed since the transaction was closed, we are of the opinion that the doctrine of Hammond v. Hopkins, 143 U. S. 224, 12 Sup. Ct. 418, 36 L. Ed. 134, may properly be applied. The purchase was not absolutely void, but at the most voidable. If attacked within a reasonable time, it could have been set aside upon proof that the executor had fraudulently used his position of trust and confidence to take undue advantage of his niece by securing her property at less than it was fairly worth. But because a transaction may be set aside upon proof, it does not follow that it will be set aside without proof. There is no proof in this record to sustain the charge of fraud and undue advantage. The fairness of the transaction is confirmed not only by the complainant's approval at the time, but by her long acquiescence since.

6. During the administration of the estate, the complainant prosecuted a suit for divorce, involving the custody of her child. A decree was granted in January, 1887; and at this time, acting upon the advice of her attorneys, she executed two trust deeds to her uncle Charles H. Hackley—one for $50,000 for her own benefit, and the other for $25,000 for the benefit of her child. She charges that the defendant and his attorneys induced her to make these deeds. The testimony shows that it was her attorneys who suggested it, for the purpose of placing the property beyond the possible reach of her divorced husband, and to secure her and her child a competence, whatever might happen. The advice was good. Subsequent events have confirmed its wisdom. The proof shows she was a woman of extravagant habits. She has been married a number of times since her first divorce, and, if she is to be believed, some of her marriages have been expensive episodes. At any rate, she has spent or lost about all the money she has been free to handle. It is fortunate for her and her child that the amounts covered by these trust deeds were placed beyond her control.

7. Another ground of complaint is the executor's charge of $10,000 for extraordinary services. It appears that during the administration of the estate the executor was not only required, in addition to his other duties, to prosecute the divorce suit of the complainant, but to defend the estate against the claim of a notorious woman with whom Porter Hackley had been living, and at whose house he died. This woman claimed to be his common-law wife. Expensive litigation ensued, requiring unusual care and attention on the part of the executor. The claim was finally defeated. After these matters were

cleared up, there was an arrangement between the executor and his niece by which he was to be allowed $10,000 for his services as executor, upon the understanding that one-half of this amount was to be donated to Mrs. Buck, a relative who had received nothing under Porter's will. This arrangement was carried out. Mr. Hackley on September 18, 1886, sent Mrs. Buck a certificate of deposit for $5,000, with a note requesting her to accept the same as a "gift from Helen A. Davies, and myself, to aid in taking care of yourself and family." Testimony was introduced tending to show that the services the executor rendered were reasonably worth $10,000. It is not necessary, however, to discuss this. We prefer to place our refusal to disturb the allowance upon the ground that the arrangement, after being fully presented to the complainant, not only had her sanction at the time, but was afterwards ratified by her approval of the final account of the executor, in which the allowance was set forth as one of the items of disbursement.

8. The final account of the executor was presented to the court of probate on February 11, 1887. On that day Charles H. Hackley paid the complainant the sum of $14,081.67, being the balance due her. She examined the itemized statement of receipts and disbursements, and executed the following receipt and release, which was indorsed upon it:

"The foregoing account of Charles H. Hackley, executor of the last will and testament of Porter Hackley, deceased, is correct and I hereby approve and ratify the same in all respects. And I hereby admit the payment to me on this day by said executor, of the sum of fourteen thousand eighty-one and $7/100 dollars ($14,081.67), being the final balance due me from said executor, on account of my interest in said estate, as sole legatee thereof.

"And I hereby release and discharge said executor, from all claim and demand of every kind and nature which I have or may claim to have against him, by reason of or on account of his administration of said estate.

"Dated Muskegon, Mich., February 11, 1887.
          "[Signed]                               Helen A. Davies."

Orrin Whitney, then the judge of probate of Muskegon county, testified that on that day Mr. Hackley and Mrs. Davies came in with the statement that the estate had been administered.

"Q. Was this in writing? A. Yes, sir; and that he had paid all the debts and settled everything satisfactorily; paid her what belonged to her— what was coming to her; and she expressed herself as perfectly satisfied, and likewise made affidavit to that effect."

The following is the affidavit referred to:

"State of Michigan, County of Muskegon—ss:

"Probate Court of Said County.

"In the Matter of the Estate of Porter Hackley, Deceased.

"To Hon. Orrin Whitney, Judge of Probate Court for Said County. Your petitioners, Charles H. Hackley and Helen A. Davies, both of the city of Muskegon, in said county, respectively represent as follows: That your petitioner Charles H. Hackley is the executor of the last will and testament of said Porter Hackley, deceased, and your petitioner Helen A. Davies is the sole legatee under said will (she being the same person who is named in said will as Nellie A. Hackley); that said executor has administered all the estate of said deceased which has come to his possession or knowledge, and has paid all the debts and claims allowed against said estate, and the expenses

of administration, and has paid to said Helen A. Davies all the residue of said estate. And said Helen A. Davies says that she hereby acknowledges the payment in full to her of all moneys and interest in said estate to which she is entitled, and she hereby releases and discharges said executor from all claims, demands, and indebtedness which she has or can have against him as such executor, or by reason of anything which he has done or omitted to do in the execution of said will. And your petitioners pray that said estate may be closed, and said executor discharged and acquitted from the further administration thereof, and that his bond as executor may be canceled, and that your petitioners may have such other relief in the premises as they may appear entitled to. And your petitioners will ever pray," etc.

    "[Signed]                              Charles H. Hackley. Executor.
                                            "Helen A. Davies."
                            (Verification.)

The final account presented to the court was not filed. It was retained by the executor (being open to her inspection at any time), and was produced in evidence. Obviously the paper was of more importance to him than to any one else. As was stated in Loomis v. Armstrong, 63 Mich. 355, 363, 29 N. W. 867, 871:

"If the estate has been properly administered, and the proceeds disposed of according to law, it is of little consequence to those who have received them whether the evidence of that fact is perpetuated by a decree in the probate court or not, while the final settlement and decree is really the administrator's best protection against the claim of heirs as in this case is now made."

A review of the whole testimony has failed to satisfy us that either of the defendants was ever actuated by fraudulent motives in their dealings with the complainant. We think they intended to, and did, treat her fairly in their business transactions. There was testimony to the effect that when the articles of copartnership were executed, and Porter notified that he must make a will, he offered to leave his property to his brother Charles H., but Charles declined to take it, and suggested that it be left to their niece Nellie, as he had enough of his own. We are inclined to believe that the complainant owed her legacy to her uncle's suggestion, and that, as executor, he did what he could to handle it to her best advantage.

The decree of the Circuit Court is accordingly affirmed.