CARDONER v. DAY et al.

(District Court, D. Idaho, N. D.    January 25, 1918.)

No. 680.

1. DESCENT AND DISTRIBUTION ⚖️84—PURCHASE BY ADMINISTRATOR FROM HEIR—EFFECT OF DISTRIBUTION—"PROPERTY OF ESTATE."

Rev. Codes Idaho, § 5543, providing that no executor or administrator may purchase any "property of the estate" he represents, nor must he be interested in any sale, does not apply to property which has been distributed to an heir by a formal order of the probate court.

2. DESCENT AND DISTRIBUTION ⚖️84—PURCHASE BY ADMINISTRATOR FROM HEIR—VALIDITY.

The purchase by an administrator in person directly from an heir of the latter's interest in the estate is not absolutely void, but voidable only, at the option of the vendor.

3. MINES AND MINERALS ⚖️55(8)—SALE OF INTEREST IN MINE—RESCISSION FOR FRAUD.

Evidence *held* insufficient to entitle complainant to a rescission of the sale of her one-sixteenth interest in a mine to defendant, part owner and manager, on the ground of fraud in misrepresenting or concealing facts about the mine.

In Equity. Suit by Mathilde Cardoner against Eugene R. Day and others. Decree for defendants.

Graves, Kizer & Graves, of Spokane, Wash., Morgan J. O'Brien, of New York City, and Joseph R. Wilson, for plaintiff.

C. W. Beale, of Wallace, Idaho, James E. Babb, of Lewiston, Idaho, John P. Gray, of Cœur d'Alene, Idaho, and I. N. Smith and John H. Wourms, both of Wallace, Idaho, for defendants.

DIETRICH, District Judge. Plaintiff prays for a rescission of the sale by her to certain of the defendants of her one-sixteenth undi-

⚖️For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

vided interest in the Hercules mine, one of the large operating lead properties in Shoshone county, Idaho. The sale was definitely agreed upon October 28, 1916, at which time a part of the consideration was paid and the deed executed, and the balance of the consideration was paid and the deed delivered on November 14, 1916. Pursuant to the direction of defendant Eugene R. Day, to whom, through the agency of defendant Allen, the plaintiff negotiated the sale, the deed was made to the defendant Eleanor Day Boyce. At the time of the transaction each of the defendants, with the exception of Allen, had separate undivided interests in the property, the operating organization being in the nature of a mining partnership, as provided by the laws of the state. Besides a mill, which it had maintained from the beginning, the company had recently made provision for the more direct marketing of its product by the acquisition of stock in a smelter and refinery. For her entire interest—that is, a sixteenth of all the partnership assets, including the cash reserve carried for operating purposes—the plaintiff received $350,000. Eugene R. Day, who for convenience will hereinafter be referred to as Day, was, and for several years had been, the partnership manager. He was also the administrator of the estate of Damien Cardoner, the plaintiff's deceased husband, from whom she inherited her interest. At the time of the commencement of the suit the interest was owned in four several parts, by Day, his sister, Eleanor Day Boyce, and his brothers, Harry L. Day and Jerome J. Day, who are the only defendants having any real interest in the controversy; the others having been joined for procedural purposes only.

There are charges of both actual and constructive fraud. As to the former, in substance the plaintiff's claim is that the defendant Allen, instigated by, and in collusion with, Day, made false representations to the plaintiff as to the condition of the property and its future prospects, for the purpose of alarming her and inducing her to make a hasty and improvident sale, and that, because of her friendship for and confidence in him, she believed him, and was thus fraudulently induced to sell at a grossly inadequate price. In bringing about the sale, Allen undoubtedly acted as the plaintiff's agent, and the few circumstances which upon their face were perhaps sufficient to warrant suspicion of collusion are satisfactorily explained. Allen was not in the employ of Day or his sister, nor did he act in concert with or at their suggestion. I am convinced that he endeavored to get as high a price as possible. True, he suggested certain considerations to the plaintiff, which it may be assumed were intended to put her in a frame of mind to give serious thought to Day's offer; but such is the practice of real estate brokers who are trying to bring together the owner and prospective purchaser. He made no misrepresentation of facts, and laid before or discussed with her only possibilities which furnished legitimate subjects for consideration. Moreover, I am satisfied that at no time did the plaintiff entertain the view that he was representing Day's interests, rather than hers. To say the least, the earlier conferences between them are entirely consistent with the theory that she regarded him as her agent, and later, be-

fore the sale was consummated, she so designated and empowered him by a formal written instrument.

True, at the bank, when the escrow was being deposited, upon the question of Allen's compensation being raised, she seems to have made the suggestion that he was working for the Days. But I am inclined to think that the remark is more significant of thrift than of candor, and was not very seriously intended. Certain it is that she did not press the point, but, without objection or protest, aside from the single suggestion, she promptly turned over to Allen a check which she held, for $5,000, the amount mutually agreed upon. Their relations continued to be friendly, and Allen continued to act as her agent in looking after her property interests in Shoshone county. In respect to all other matters, as appears from the letters in evidence, he seems to have been painstaking and to have protected her with the most scrupulous care. His apparent candor and directness as a witness left no doubt in my mind of his good faith, and, besides, to take the plaintiff's view is necessarily to accept the wholly improbable theory that not only Day and Allen, but the latter's aged father-in-law, a state district judge, with whose family the plaintiff had long been upon terms of intimate friendship, and his wife, had entered into a conspiracy to defraud her. I have no hesitation in dismissing this charge.

It is urged, however, that Day's relations to the plaintiff were of such character that (1) under the statutes of Idaho he was without the capacity to make the purchase, or (2) if not wholly incompetent, his disability was such that he could purchase only for a fair price, after disclosing to plaintiff all the information within his possession, and that not only did he withhold material facts from her, but the price paid was in fact grossly inadequate.

[1] The first contention is predicated upon section 5543 of the Idaho Revised Codes, which provides that "no executor or administrator must, directly or indirectly, purchase any property of the estate he represents, nor must he be interested in any sale"; and the precise question is whether, at the time of the transaction of sale, or the negotiations pertaining thereto, the property sold was "property of the estate" of Damien Cardoner, of which Day was the administrator. The material facts are as follows:

Damien Cardoner died in February, 1915. Upon the request of his daughter, and apparently with the plaintiff's approbation, Day was appointed administrator (with the will annexed) on July 29, 1915, and immediately qualified and entered upon the discharge of his duties. On September 27, 1916, he filed his final account, praying for its approval, and also for a decree distributing the estate. Upon the same day the plaintiff filed a petition representing that all claims had been paid, and that the estate was ready for distribution, and prayed for a decree distributing the whole thereof to her. Upon October 14, 1916, both plaintiff and Day, and their respective attorneys, being present, the court duly entered an order approving the account, and in compliance with the plaintiff's prayer, distributing the entire residue of the estate to her, consisting of about $120,000 in cash, and

other property of the value of approximately $35,000, besides the mining interest here in controversy, all of which Day forthwith turned over to her. This order or decree was filed for record in the office of the county recorder of Shoshone county on October 25, 1916.

The order formally closing the estate and discharging Day from further responsibility was not entered until November 1, 1916; but this fact, upon which the plaintiff chiefly relies to support her contention, is thought to be unimportant. Under the state laws, the property of a deceased person passes to the heirs "subject to the control of the probate court, and to the possession" of the administrator. Section 5701. But upon the entry of a decree of distribution the right of possession in the administrator terminates and his authority relative to the property ceases. Sections 5626 and 5627. The property distributed is no longer a part of the estate intrusted to the care of the administrator. Touching it, both his rights and his obligations are at an end. If upon such distribution the property does not cease to be a part of the estate, when, if at all, is it withdrawn from administration? In a popular sense, of course, it may always be spoken of as the deceased's estate. But section 5543 is to be understood in a legal sense. The principle or reason upon which the section is predicated is obvious: A trustee (the administrator) is not to purchase property to which his trust relates. But distributed property is no longer a part of his trust; it is out of the trustee's possession and control.

Plaintiff directs attention to section 5631 et seq., where provision is made for the partition by proceedings in the probate court of distributed property; but, even if it were conceded that this is a matter with which the administrator is in any wise concerned or touching which he has any right or duty (which is extremely doubtful), it will be noted that to invest the probate court with jurisdiction for this purpose some person interested must file a petition for partition before the decree of distribution is made. Section 5632. In the absence of such petition the property not only ceases to be under the control of the administrator, but passes out of the jurisdiction of the court. Buckley v. Superior Court, 102 Cal. 6, 36 Pac. 360, 41 Am. St. Rep. 135; Morffew v. San Francisco & S. R. R. Co., 107 Cal. 587, 40 Pac. 810; Moore v. Lauff, 30 Cal. App. 452, 158 Pac. 557. There is no pretension here that such petition was filed, or, indeed, that it was a case where it could be filed. Hence, when the decree of distribution was entered upon October 14th, not only did Day lose control of the property, but it passed beyond the jurisdiction of the court. Cases like Jones v. Broadbent, 21 Idaho, 555, 123 Pac. 476, McCrea v. Haraszthy, 51 Cal. 151, and Dohs v. Dohs, 60 Cal. 255, are not thought to be in point.

We are not concerned with the question when the administration of an estate terminates, but when specific property ceases to belong to the estate—when it ceases to be held by the administrator in trust. It would be quite as reasonable to say that property which an administrator has sold and conveyed, pursuant to valid orders of the court, continues to be property of the estate until the administration is closed

and the administrator discharged. The decree of distribution in the one case is quite as effectual as the administrator's deed in the other to terminate the trust. (Incidentally it may be observed that, were the California cases in point, plaintiff would not be warranted in her contention that we are bound to give to the Idaho statutes the same construction as was there given to the corresponding California statutes. Assuming that Idaho adopted the statutes from California, such adoption took place in 1864, long before the cases relied upon as controlling were decided. See Laws Idaho [First Sess.] 1864, Probate Practice Act, §§ 193, 258, 259, 264, 279.)

[2] But, if a different view could be taken, the result must be the same. The purchase by an administrator in person directly from the heir, of the latter's interest in the estate, is not absolutely void, but voidable only, at the option of the vendor. Mills v. Mills (C. C.) 57 Fed. 873, 878, 879; s. c. (C. C.) 63 Fed. 511; Haight v. Pearson, 11 Utah, 51, 39 Pac. 479; Golson v. Dunlap, 73 Cal. 157, 14 Pac. 576; French v. Phelps, 20 Cal. App. 101, 128 Pac. 772; Littell v. Hackley, 126 Fed. 309, 61 C. C. A. 295; Black on Rescission and Cancellation, vol. 1, p. 114, § 48; Perry on Trusts (6th Ed.) § 205; Woerner's American Law of Administration (2d Ed.) § 487. And compare Hammond v. Hopkins, 143 U. S. 224, 249, 12 Sup. Ct. 418, 36 L. Ed. 134, with the earlier case of Michoud v. Girod, 4 How. 503, 11 L. Ed. 1076. In Blackinton's Estate, 29 Idaho, 310, 158 Pac. 492, there are expressions of ambiguous import upon the subject, but these were expressly declared by the court itself to be obiter. The administration here was technically closed, and Day discharged as administrator, upon November 1st. Thereafter admittedly he had the capacity to purchase, and from that time on for over two months the plaintiff stood upon the contract of sale. After November 1st she accepted the larger part of the purchase price, and, by such acceptance and her failure to object or protest, approved the transaction and authorized the escrow holder to deliver the deed. Indeed, if I have correctly read the record, never was this objection raised or suggested by her until urged by counsel in the oral argument at the close of the trial. It would be necessary, therefore, to hold that she acquiesced in and ratified the transaction, even were the view taken that the original agreement was made when Day was under disability to contract by reason of the estate not having been formally closed. 39 Cyc. 370; Hammond v. Hopkins, 143 U. S. 224, 251, 12 Sup. Ct. 418, 36 L. Ed. 134; Mills v. Mills, supra. I do not hold that the comparatively short delay necessarily constitutes laches or estoppel. But by actively participating in the consummation of the unexecuted agreement, after such disability as Day may have had was removed, she directly confirmed the sale.

[3] Finally, can a reason be found in the fact that Day was, and for a long time had been, the manager of the mine, for holding the sale voidable? In this aspect we have the case of an agent dealing with his principal touching property to which the agency relates. Under what limitations or subject to what conditions could he make a valid purchase? His position doubtless gave him peculiar oppor-

tunities for knowing all the facts and estimating the reasonable probabilities, and it was his duty to deal fairly with the plaintiff. He could lawfully purchase her interest, but before doing so he was bound to disclose to her the facts and conditions, which had come to his knowledge as manager, bearing upon the value of the property. He could take no advantage by misrepresentation, concealment, or omission to disclose. He was not required to express himself relative to matters merely of speculation or surmise, but in so far as he chose to give an opinion he was bound to act honestly and in good faith. Byrne v. Jones, 159 Fed. 321, 90 C. C. A. 101. In a sense, of course, the two parties could not be put upon the same footing. Personally the plaintiff had had no practical experience in mining, and presumably, therefore, was less competent than Day to form an intelligent opinion, or to speculate upon the ultimate question of the commercial value of the property. But the sale cannot be set aside for that reason alone. The plaintiff was not an ignorant, unsophisticated woman, nor was she without knowledge of the mining business. While her speech is marked by a strong foreign accent, she is not without facility both in using and understanding our language. She has not lived a cloistered life, nor does she give the impression of being by nature abnormally trustful or confiding. She is fairly well educated, to say the least, and has the poise and self-reliance which come from travel and the rigorous experiences of a pioneer life. In short, I would think that in any ordinary business transaction she could not easily be deceived or overreached. She came into the Cœur d'Alenes from France in 1886 with her husband, who thereupon engaged in merchandising. Their controversies with each other need be referred to only in so far as, in a circumstantial way, they tend to disclose a disposition upon her part to assert her rights. For 20 years she resided in Shoshone county, during which period the defendants and her husband had gradually developed the Hercules claim into a producing property. Mining was the one industry of the community, and living a considerable part of this period, as the plaintiff did, within a "stone's throw" of the Hercules and other claims and operating properties, she must have gotten some conception of mines and mining. In 1906 she went with her husband and daughter to Spain, where they all remained until her husband died, in 1915. Apparently he at once became active in mining operations there, with which, as she somewhat reluctantly disclosed, she had a measure of familiarity. But, retaining his interest in the Hercules and in other property in Idaho, he not infrequently came to this country, presumably upon business relating thereto. They subscribed for and read a Spokane paper and a Wallace paper, each of which, it is to be inferred, published mining news of the Cœur d'Alenes, and reported mine dividends.

Upon Mr. Cardoner's death, their daughter came to Idaho, and while here procured the appointment of Day as administrator. Later, the plaintiff, who in the meantime had had some disagreement with her daughter and son-in-law, returned, after an absence of 10 years, arriving at Spokane on April 17, 1916. In the meantime, too, it ap-

pears, she had decided to ignore her husband's will, by which a considerable part of the estate was bequeathed to the daughter and some legacies were left to religious or charitable orders, and to claim all of the property, upon the theory that, belonging to the community, it was not subject to testamentary disposition, but came to her as of right under the state law of succession. When Day first learned of this change of attitude does not clearly appear, but it was doubtless after her return. It would unduly extend the discussion to relate with any detail the subsequent course of events. Plaintiff took up her residence at Spokane, from which point it was easy to communicate with the mine, and especially with Wallace, where the principal offices of the company were maintained, and where the court sat in which the estate was being probated. At Spokane, too, the defendants Paulsen and Hutton, two of the wealthiest owners of the Hercules, lived and had large business interests. In so far as she knew or the record discloses, their relations with her husband had been friendly, and they would not be inclined to treat her ungenerously. Immediately upon arriving at Spokane she communicated by telephone with Day at Wallace, and by appointment visited him there, at the offices of the company, two days later. Upon at least three other occasions prior to the distribution of the estate, twice in August, she conferred with him there. He is insistent that she came to his office and discussed the affairs of the company with him at least a dozen times. But, inasmuch as she may have spent several days at Wallace upon a single visit, the apparent conflict in the testimony may be reconciled by assuming that she went to the office more than once during each visit.

Unfortunately, upon the important question of what information relative to the mine Day gave her, the direct evidence, consisting almost exclusively of the testimony of the two parties most concerned, is highly conflicting. In substance her contention is that he made no disclosures at all, but repeatedly put her off, generally with the excuse that he had no time. Upon the other hand, he very positively testifies that again and again he explained truthfully and in detail the status of the property, and advised her of what had been done and what they were planning and expecting to do. With equal emphasis, too, she makes the specific contention that she did not learn that the company had engaged in the smelting or refining business until she read about it in a mining journal, in November, 1916, after she had gone to New Mexico. Upon this point I am wholly unable to give her testimony credence. If we are not permitted to take judicial notice of facts of local and familiar history, still we cannot avoid the inference or presumption that this smelter enterprise, together with the conditions out of which it grew, must have been an important event in the industrial life of the "Inland Empire," including North Idaho and Eastern Washington. It must have been in the newspapers, and the chances of its success or failure must have been common topics of discussion. True, the plaintiff came to this country after the public interest had abated; but, as already stated, she was receiving newspapers from Wallace and Spokane while in Spain, and, besides, her son-in-law and daughter were here in the sum-

mer of 1915, and it is wholly unlikely that they failed to hear of it or inform her.

But, if we put aside these considerations, we find that in the monthly statement of the company for February, 1916, which admittedly she received soon after coming to Spokane, there is shown a large expenditure on account of the smelter. Day testified that at their first conference she told him that her husband had been opposed to going into the smelting business, and questioned him about it. Allen testified that immediately after the decree of distribution, in conversation with him about the mine, she discussed the new smelter and refinery. Paulsen, a disinterested witness, testified that when she called upon him in October, shortly before the sale, and inquired why certain dividends had been passed, he explained "that the Hercules had gone into the smelter business and branching out, and that they had to build up a reserve to take care of these additional business propositions, and also that we had a large amount of ore in transit to the smelter, which had not then been settled for"; and he also sought to quiet her apparent agitation over a newspaper report to which she directed his attention, to the effect that the "Guggenheims or the American Smelting & Refining Company * * * were going to absorb all of the Day interests in the Cœur d'Alenes, and smelters and everything they had."

With much alacrity, I thought, and with unnecessary frequency, the plaintiff, in testifying, sought to give the impression that she knew nothing about business customs in general, or about her husband's business or the Hercules mine in particular. Admittedly her husband regularly received the monthly statements which the company had long been accustomed to send to its members, upon which were shown, not only the summarized items of operating receipts and disbursements for the month, but the aggregate of all dividends paid during the entire life of the mine. It is true that when, upon cross-examination, her attention was directed to the contents of these statements, she explained that she could not understand, and perhaps did not read, them; but in that connection it is thought to be significant that when upon her direct examination she was first asked why she called Day up by telephone immediately after coming to Spokane, and why, according to appointment, she went to Wallace two days later, she answered:

"To see Mr. Day and ask him for the statements. Since Mr. Cardoner died he never sent us any more statements, and I went up to ask him for the statements."

It is difficult to avoid the belief that she was measurably familiar with these monthly statements, and was able to interpret them in their main features. Plainly she is not without some aptitude for, and experience in, business matters. She seems to have been careful and methodical, and even exacting, in respect to other transactions brought into evidence. She was quick to discover apparent discrepancies and inconsistencies in the administrator's accounts, and proceeded in an intelligent way to procure explanation and rectification. She kept a diary with unusual care, required receipts for disbursements, and

altogether made inquiries and gave directions, not in the language of an unsophisticated woman, but in terms signifying that she was not a stranger to business transactions. It is not a case where the principal is at a distance and wholly dependent upon the information furnished him by his agent or associate, or is a stranger with no one to whom to turn for assistance or advice. The company's mill was within a few moments' walk from the offices at Wallace, and the mine a few moments' ride upon the train or by automobile. They were at all times accessible and open to the plaintiff, and so were the books and records of the company. Of this there is no question. She had agents at Wallace, and she had acquaintances and friends. If she did not understand an item in one of the monthly statements, she could as readily and as reasonably have asked Allen for assistance as in the case of the administrator's account, or she was abundantly able to employ service of that character. She had engaged counsel, who was not only qualified to care for her interests in their legal aspects, but was also exceptionally familiar with the history and operation of the Hercules as well as other mines in the district. At intervals she was a guest at the house of the presiding judge of the state district court, at one time her attorney, who also was familiar with the history of the district, and in a general way with the various properties therein.

For Day to have repeatedly denied her information about the Hercules would have been a flagrant violation of his duty, both as manager and as administrator, on account of which the plaintiff might very reasonably, and I think would, have been deeply offended. Yet, so far as appears, she made no complaint to her friends or to her attorney, nor did she suggest criticism of him as manager to her associate owners, Paulsen and Hutton. Instead, she seems to have continued to hold him in high esteem, and to entertain for him a friendly feeling until, after going to New Mexico in December, she was advised by her attorney from the East (acting in perfect good faith, I doubt not) that upon inquiry he believed that the price she had received was inadequate. Furthermore, if we credit her story, we must also believe that, without suspicion or resentment against him, notwithstanding the ill treatment which she now charges at his hands, upon five days' consideration she sold to Day the very property concerning which he had persistently denied her information, and upon representations chiefly made by Allen, whom she looked upon as Day's agent. However tenderly we may regard her rights by reason of her sex and widowhood, we cannot give credence to the incredible. From the whole record I am convinced that from the beginning she was aware of the smelting enterprise, and was concerned about it. The mine had been shut down for some length of time in 1915, because of the smelter controversy. Her husband had not looked with favor on the company going into the smelting business, and upon his death she would be likely to succeed to his views. Not unnaturally, therefore, at her first interview with Day she would raise the question, and quite as naturally, as manager, he would defend the new enterprise and explain the reasons which induced him and the other

owners to undertake it. Such explanation and defense would almost of necessity lead to a comprehensive account of the mining operations, the condition of the mine, and the future plans and prospects of the company, and, in giving it, Day's natural inclination would be to paint a bright, rather than a gloomy, outlook for the property.

Such, I say, are the probabilities, and such, in substance, I believe to be the facts. It may very well be that, not being fully satisfied touching the smelter enterprise, or her fears being revived by the passing of dividends, or by suggestions in the press or from friends of the peril of a local company fighting what was popularly referred to as the smelting trust, she renewed her questionings from time to time as she talked with Day, until, becoming impatient, he declined again to review the situation in detail, and put to her the inquiry whether she desired to sell her interest; and it is this phase of his treatment of her that, in her resentment, upon being advised that she had been overreached, she has perhaps unconsciously put in the foreground of her recollection until it has obscured all else. In some respects I am satisfied she has unwittingly lost the true perspective. By her testimony she gives the impression that Allen and Judge Woods and his wife made misrepresentations from which it would follow that the property, if not practically worked out, had only a speculative value, and yet for such a property Day, its manager, was admittedly making an offer based upon a value of $5,000,000, a price in excess of anything ever paid or offered for any interest in the mine before. If, as apparently she would now have us believe, she became panic-stricken, and by Allen and her other friends was induced to believe the property was practically worthless, did she think that in receiving at the rate of $5,000,000 from Day she was overreaching or getting the best of him? It was probably suggested to her that the price of lead, then abnormally high, might drop back to a lower level at any time; but surely that was a legitimate consideration. It probably was not said that when she went away Day would send her no more dividends, but upon the other hand it probably was said that at times, as had been the case in the last two years, she might get no dividends; whereas, if she sold her property, and the proceeds thereof were put out at interest, she would be sure of regular interest returns—again a legitimate consideration. It was probably not represented that the Days were speculating upon the lead market, in the sense that they were illegitimately using the company's funds for that purpose, and that they would be smashed by the Guggenheims, and that the plaintiff would thus lose all; but it may very well have been stated that in going into the smelting business the company would have to market its own product, and that in doing so it would come into competition with the Guggenheims, or the so-called smelting trust, and that therefore there was danger of disaster or loss. There probably was no representation that the property had been mined out; but I have no doubt that by different persons she was informed that above the No. 5 or Hummingbird tunnel, which was the lowest possible tunnel level, the ore was almost exhausted, and that the lower shafts and works were still incomplete,

leaving the lower ore bodies not fully developed or disclosed, and as to their extent there was some doubt and uncertainty. And such appear to have been the facts. Paulsen, whose intelligence and good faith there is no reason to question, testifies that when she called upon him, a few days before the sale, he told her that "there was a good deal of guesswork connected with fixing the price of the mine in the state of development that the mine was in at that time"; that they were behind with their developments, their shaft from the Humming-bird tunnel was not started early enough, and that the ore reserve above the tunnel level was getting pretty low, and that at that time they "did not have such an awful lot of ore exposed or developed." Indeed no one described the physicial condition of the property more conservatively, or gave more prominence to the uncertainties involved in making an estimate of the value of the mine, than Paulsen, and yet at the same time he told the plaintiff that his interest was not for sale, thereby intending to convey the meaning that he regarded the mine as a good property; and the plaintiff admits that she understood him to advise her to hold on to her interest.

Doubtless in the course of the discussions which took place her attention was drawn to the fact that some of the other mines in the district had been worked out at a certain depth, and the inference was drawn that the ore shoots in the Hercules would probably terminate at about the same depth. But the record abundantly shows that such a view was not unreasonable. True, the plaintiff may have attached undue importance to some of these considerations, and may not have given due weight to Paulsen's advice to hold her interest; she was suffering somewhat from the asthma, and was probably anxious to get into a different climate, and may have acted hastily. But in the light which she had, or which was then available, did she act in a panic or unreasonably? If we strike from the record the expert testimony of the two engineers, which, of course, was not available to her or any one else at the time, and put out of mind the fact that our country is now at war, and the conditions bearing upon the net value of the product of this mine, which did not arise or were not disclosed until after October, 1916, in the light of the other facts and circumstances of record, can it be confidently said that from the standpoint of an intelligent, independent owner, the plaintiff made a bad bargain?

Suppose we look at the situation for a moment from her standpoint. She knew that a little more than a year before her interest had been valued by the appraisers of the estate at $250,000; that there had in the meantime been paid to the administrator, for her credit, by way of dividends, over $100,000, so that, if the appraisement was originally correct, the residual value of her interest could not at the time of the sale have exceeded $175,000; and for this she was considering an offer of $350,000. Through her husband she probably knew that in 1905, when, of course, the mine was in fact of much greater value than in 1916, he and the other owners gave an option to purchase the entire property for $4,000,000; and again in 1906 an option to purchase at $6,000,000; and in each case the optionee

declined to purchase, in the latter case suffering a forfeiture of $20,-000. She may very well have known that two or three years later a one-sixteenth interest—the Reeves interest—had been sold for $250,-000. She had the very recent opinion of Hutton, one of the owners, whom she doubtless thought to be intelligent and disinterested, that the property as a whole was then worth about $4,000,000. Paulsen, another intelligent owner, who she had the right to think would advise her fairly, declined to make an estimate of the value, because it involved too much guess work, discouraged the idea of selling, and yet suggested that in either case, she would doubtless have all she needed. She knew that current profits were enormous, but she also knew that the price of lead was abnormally high, owing to conditions which might pass at any time, and that the cost of production was also upon the increase. There were elements of uncertainty about the extent and value of the remaining ore bodies, which had been but meagerly explored. The smelting enterprise was giving her concern. It might be safe, but her husband had disapproved, and there were questionings touching its wisdom; it was a new field, with unknown possibilities. For reasons of health she did not desire to reside in this section of the country. She had other property holdings in the Cœur d'Alenes which were likely to give her some annoyance, and Day was agreeing to take them over as a part of the transaction, at a price apparently in excess of what he thought they were really worth. In case of sale she would have, besides her interest in the estate in Spain, approximately a half million dollars in money, and this, if conservatively invested in high-class securities, would, without substantial risk, yield a regular income abundantly sufficient for her wants, and she would be relieved of all responsibility and concern. Besides—and I think this consideration had much weight with her, regardless of its merit or want of merit in point of law—she was not without fear that the legatees named in her husband's will would seek to assert rights thereunder, and she reasoned that such a contingency was much less likely to happen, or to turn out adversely to her, if she disposed of all her interest in the specific property of the estate. Upon the whole, I do not think it can be held that under the known conditions her decision to make a sale was precipitous or improvident.

When we come to consider what in fact was the actual value of the property, we are met with difficulties which both courts and legislators have recognized as well-nigh insurmountable. Because of these difficulties, in this state, as in some other jurisdictions, no attempt is made to estimate the value of mines for taxation purposes. But it does not follow, because the value is difficult accurately to estimate, that an agent or part owner cannot legitimately purchase from his principal or associate owner.

The ultimate question with which we are here concerned, of course, is not how much ore there was in the mine, but what the property was reasonably worth upon the market in cash—what it should have reasonably sold for under the circumstances. The plaintiff had the right to sell her interest. She was not bound to keep it indefinitely and exploit it. So the ultimate question is, not what she might have

made out of it if she had chosen ·to retain it, but what it was worth—what it could have been sold for outright. The value of a dairy cow is what she will presently sell for upon the market, and not what she will ultimately yield in profit, if kept indefinitely in the dairy. Nor, of course, does the inquiry here relate to the amount of ore that subsequent developments may disclose to have actually been in the mine. The mineral content of the mine is a material inquiry only because it is a matter to which both the owner and the prospective purchaser would give consideration. They would undertake to estimate the amount of the ore, and the estimates would have some bearing upon the price which an owner would take and the price which an investor would pay. Hence the question is, not what the mine actually contained, but what, under the light then available, was a reasonable estimate of its content. Such estimate, of course, is only one of the important factors, and when we consider all of them we find that the margin of uncertainty is so great that any opinion of the value must be measurably speculative.

The truth of this observation is strikingly illustrated in the evidence given by the two experts who testified, one for the defendants and the other for the plaintiff. Even with a mine so far developed and so fully equipped, there is a wide range of uncertainty as to the extent and quality of the ore bodies. There is next the question of the cost of extracting, treating, and marketing the ores—a process which must extend over a period of years, with uncertainty touching wages, rates of transportation, and other expenses. Then the uncertainty as to the price at which the product can be sold; and still the further question, in estimating the present worth of ores in the earth, of how long it will be before they can be marketed and turned into cash, thus releasing the invested capital, which, until so released, is, of course, unproductive. Furthermore, at the time of the sale it was wholly uncertain whether this country would or would not be drawn into the world war. Should we enter the war, how soon would it end, and what effect would its termination have upon the mining industry? If our country declared war, what effect would such declaration have upon the cost of production and the price of the product? Would the prices be fixed by governmental agency, and what burdens would be levied upon such properties by way of taxation? One contemplating the possible purchase of a sixteenth interest in the mine would further consider the question of labor, the tendency to increase of wages, the possibility of strikes, and, I think, would very seriously consider the question of management. Apparently the management had been conservative and intelligent. What would be the effect on the market value of a sixteenth interest, if, for example, the Days and Paulsen should combine and sell out their controlling interest to an unknown and inexperienced investor, whose policies were unknown, and who might unwisely manage the property, or entangle it with speculative and more perilous enterprises?

In view of these admitted uncertainties and the wide variance between the estimates of the experts, manifestly no safe conclusion as to the reasonable value of the property in October, 1916, can be predi-

cated upon their testimony alone, and therefore I refrain from setting forth an analysis of it. It is of value and weight in connection with the other evidence upon the subject, and I give it consideration in that connection. What, in the main, is the other evidence? Day, though not an expert geologist or mining engineer, and perhaps without experience in marketing mines, was an intelligent, practical operator, with intimate knowledge of the general conditions in and about this property. His judgment is entitled to some weight, and I am satisfied that he would not have given more for the plaintiff's interest. Some point is made that he bargained with her and sought to secure the property for a much lower figure. But it is not material to the present inquiry to determine whether or not he had the right to deal with her as an equal, if it be assumed that she had all the information that he possessed. It might very well be held that, if she knew as much about the mine as he, he had the right to buy her interest at such price as she was willing to take. But, be that as it may, whether we condemn or justify his conduct in seeking to get the property for less than he finally paid for it, the fact is that he added to his first offers until he reached the sum of $312,500, exclusive of the cash on hand, or a price upon the basis of $5,000,000 for the assets, exclusive of the cash on hand, and there he declined to go further. Through Allen the plaintiff sought to get him to increase his bid; but Day definitely declined, and I think was unwilling to pay more. His testimony now as to what he considers the property worth, as well as that of his brothers, Harry L. Day and Jerome J. Day, is in the nature of expert testimony, and, coming from an interested source, is, of course, to be considered in the light of such interest. But if, for that reason, we put aside entirely their opinion testimony, and impute to that of the opposing engineers equal weight, what have we? We have Day's decision at the time not to pay more. We have the testimony of the two disinterested witnesses, Paulsen and Hutton, the one that the property was worth no more than was paid, and the other that it was worth less. We have no instance where a larger price was ever paid or offered for any interest in the property. We have the sale of the Reeves one-sixteenth interest, seven or eight years before, when undoubtedly the actual value was greater than in 1916, for $250,000. We have the unaccepted offers of the owners to sell the whole property in 1905 for $4,000,000, and in 1906 for $6,000,000. If it be said that to Day the interest had a special value, because it gave "the Days" control of the mine, the obvious reply is that to an independent investor, generally speaking, so small an interest would be less salable, and that therefore its market value, when offered alone, could hardly be said to be equal to one-sixteenth of the market value of the property as a whole.

Upon consideration of the entire matter, my conclusion is that, not only was the plaintiff informed of the known conditions and facts bearing upon the value of the property, but that the price paid approximated the reasonable market value of her interest, and was probably as much as she could have obtained from any other source, and, in any view of the bearing of the question of value upon the issue here, an approximation of the true value is all that is required. Brooks v. Martin, 69 U.

S. (2 Wall.) 70, 17 L. Ed. 732; Patrick v. Bowman, 149 U. S. 411, 13 Sup. Ct. 866, 37 L. Ed. 790.

From these considerations, it follows that the bill must be dismissed; and such will be the decree.