**Martha Cuneo REED, Plaintiff,**

v.

**Albert F. ROBILIO, Mrs. Jennie G. Robilio, John S. Robilio, Rose Ann Robilio, Florence Rita Robilio Radogna, Union Planters National Bank of Memphis, Tennessee, and Roane Waring, Jr., Defendants.**

**Civ. A. No. 4404.**

United States District Court
W. D. Tennessee, W. D.
Dec. 21, 1965.

Robert Fiske, Jr., of Davis, Polk, Wardwell, Sunderland & Kiendl, Leo Kissam, of Kissam & Halpin, New York City, and Walter Chandler, of Chandler, Manire & Chandler, Memphis, Tenn., for plaintiff.

Jack Petree of Evans, Petree, Cobb & Edwards, Memphis, Tenn., for defendants Robilios & Radogna.

Marion S. Boyd, of Canada, Russell & Turner, Memphis, Tenn., for defendant-executor, Union Planters Nat. Bank.

W. B. Rosenfield, of Rosenfield, Borod, Fones & Bogatin, Memphis, Tenn., for defendant-executor, Roane Waring, Jr.

WILLIAM E. MILLER, District Judge.

This is an action brought by the daughter of a deceased partner on behalf of the executor of her father's estate to impose a constructive trust upon the purchase of her father's interest in the partnership, and to have that interest reconveyed to the executor with an accounting for profits. The purchasers were the surviving partner, and a sister and two brothers of the surviving partner. The action is based on an alleged breach of the fiduciary duty which a surviving partner owes to the estate of the deceased partner to disclose facts pertinent to the valuation of the deceased partner's interest.

For a second cause of action, the plaintiff sues on behalf of the executor of her mother's estate to cancel and rescind a subsequent partnership agreement entered into between her mother and the purchasers referred to above. This cause of action is based upon allegations that (1) the agreement unfairly restricts the class of persons to whom the mother's interest in the partnership could be transferred; (2) the agreement gives the defendant purchasers, upon attempted transfer outside the restricted class, the option to purchase her mother's interest at the allegedly inadequate price of book value plus 10%, with no value ascribed to good will; and (3) the agreement was executed at a time when her mother was critically ill and unable to understand the nature and significance of her acts.

The parties are the plaintiff, Martha Cuneo Reed (the beneficiary of a trust established by her father's last will and testament); the defendant purchasers Albert F. Robilio, John S. Robilio, Jr., Rose Ann Robilio, and Florence Rita Robilio Radogna; the defendant Jennie G. Robilio (who was not a purchaser, but who endorsed the promissory notes given by three of the purchasers, and who entered into the subsequent partnership agreement); the defendant Union Planters National Bank of Memphis, Tennessee, (the executor of the estate of the deceased partner, Thomas A. Cuneo); and the defendant Roane Waring, Jr., (the executor of the estate of plaintiff's mother, Zadie S. Cuneo).

Jurisdiction is based on alleged diversity of citizenship. Before ruling on the Court's jurisdiction, it may be well to summarize the history of the action.

In 1910, John S. Robilio, Sr. established a single proprietorship in Memphis, Tennessee. In 1920, he became associated with Thomas A. Cuneo to form the partnership of Robilio & Cuneo. At its inception, and continuing up until 1929, the firm operated as a wholesale and retail seller of Italian foods, including macaroni products, cheeses, olive oils and other imported and domestic grocery items. Upon the death of John S. Robilio, Sr. in 1929, his wife Jennie G. Robilio succeeded to his 50% interest in the firm. In that year, the firm expanded its business by beginning to manufacture and sell its own products under the trade name "Ronco." Thomas A. Cuneo was active in military service from 1942 through July, 1945. During that time, Albert F. Robilio managed the business with full responsibility for every aspect of the firm's operations.

In 1943, Jennie G. Robilio conveyed a 12.50% interest in the partnership to Albert F. Robilio, and Thomas A. Cuneo conveyed a 19.34% interest to his wife Zadie S. Cuneo. A partnership agreement was then executed fixing the interests of the four partners and providing that the partnership should terminate upon the death of either of the partners. Upon such termination paragraph X of the agreement directed that all debts of the firm be paid and the remaining assets be divided "in specie" in proportion to the partners' respective interests. The ownership of the partnership remained in the names and percentages fixed in the 1943 agreement until the death of Thomas A. Cuneo on September 30, 1959.

By that time, the principal business of the firm had become the sale of its own manufactured products under the "Ronco" trade name. Thomas A. Cuneo left a will which created a marital trust in favor of his wife, Zadie S. Cuneo, and a residuary trust in favor of his daughter,

Martha Cuneo Reed. With respect to the 30.66% interest in the partnership held by Mr. Cuneo, the will contained this provision:

## "ITEM IX"

The principal asset in my estate consists of an interest in the partnership of Robilio and Cuneo. I authorize my Executor to sell this interest on whatever terms at whatever price it deems to be to the best interest of my estate; provided, however, that this interest shall not be sold without first giving my wife an opportunity either to purchase this interest or to sell her interest on the same terms and conditions that my executor has agreed to sell my interest.

The will was admitted to probate on October 4, 1959 and the Union Planters National Bank qualified as executor under the will. Postell Hebert, the Trust Officer of the bank, undertook to act for the executor.

Prior to November 4, 1959, Mrs. Cuneo decided not to purchase her deceased husband's 30.66% interest. She also decided to retain her own 19.34% interest. At approximately this same time, negotiations began between Albert Robilio and Hebert looking to the sale of the 30.66% Cuneo interest. At the outset of the negotiations, Hebert asked Albert Robilio to make an offer for the 30.66% interest. Robilio declined to do so, and requested the executor to make the first offer. On November 24, 1959, Hebert offered to sell the 30.66% interest to the Robilio family for a price of $350,000, to be paid $150,000 in cash and $200,000 in eight annual installments of $25,000. This offer was neither accepted nor rejected at that time.

On the 4th or the 6th of January, 1960, Albert Robilio made a counter-offer of $317,000 to be paid $149,000 in cash and the balance in twelve annual installments of $14,000. The sale on these terms was to be made effective as of October 1, 1959, with the purchasers receiving the profits on the interest accrued since that date, and paying 6% interest on the unpaid balance from that date. The purchasers were also given the right to accelerate. The 30.66% interest was to be allocated individually to members of the Robilio family as follows:

| | |
|---|---|
| Albert F. Robilio | 10.68% |
| John S. Robilio, Jr. | 6.66% |
| Rose Ann Robilio | 6.66% |
| Florence Rita Robilio Radogna | 6.66% |

Each of the purchasers was to make a down payment and execute a promissory note for the balance. The notes of the purchasers other than Albert F. Robilio were to be endorsed by their mother, Jennie G. Robilio. Hebert accepted this offer, conditioned upon the following approvals:

(a) The approval of the Probate Court of Shelby County, Tennessee, of the terms and amount of the offer.

(b) The approval of the Trust Investment Committee of the Union Planters National Bank.

(c) The approval of Mrs. Cuneo.

(d) The approval of Mrs. Reed.

Being satisfied that these conditions had been fulfilled, the executor, on either March 3rd or 7th, 1960, executed a bill of sale to the Robilios reciting the terms set forth above.

Following the execution of the bill of sale, the Robilios entered into negotiations with Mrs. Cuneo for a new partnership agreement. Throughout these negotiations, Mrs. Cuneo was represented by her attorney, Roane Waring, Jr. On September 9, 1960, the partnership agreement was signed. On November 1, 1960, Mrs. Cuneo died. Her will was admitted to probate on November 4, 1960, and her attorney, Roane Waring, Jr., and the plaintiff, Mrs. Reed, were qualified as co-executors. By her will, she bequeathed her 19.34% interest in the firm to her daughter, Mrs. Reed. She also exercised a power of appointment given to her by the will of her deceased husband so that her interest in the remaining corpus of the marital trust was transferred to Mrs. Reed free of trust.

Following Mrs. Cuneo's death, the plaintiff began an investigation into the above matters, and made demand on the executors to bring suit on behalf of their respective estates against the defendant purchasers to compel a reconveyance of the 30.66% interest, and to reform or set aside the subsequent partnership agreement. These demands were refused, and on December 13, 1961, plaintiff filed suit in the Federal District Court for the Western District of Tennessee.

[1] The plaintiff is a citizen of New York. The Robilio defendants are citizens of Tennessee. The Union Planters National Bank, the executor of the estate of Mr. Cuneo, is chartered by the United States Government. Since its principal place of business is in Memphis, it must be deemed to be a citizen of Tennessee. See 1 Moore's Federal Practice, § 0.77 [2.—4]. This fact is not challenged by the plaintiff. The bank is named as a nominal defendant because of its refusal to institute suit on behalf of Mr. Cuneo's estate. Roane Waring, Jr., the executor of Mr. Cuneo's estate, is a citizen of Tennessee. He is named as a nominal defendant because he has declined to bring suit on behalf of her estate. No relief is sought from either executor.

After studying the record in this case, the Court concludes that the executors must be realigned as plaintiffs, as their interests demand, and that the case must be dismissed for want of diversity between the executors and the individual defendants.

The action was heard on the merits in a protracted trial resulting in a transcript of testimony in excess of 5,000 pages. It has occupied much of the time of all concerned and doubtless has caused the par-ties a considerable expense. The Court deems it appropriate, therefore, that the reasons for dismissal should be set forth with particularity, especially since the jurisdictional defect was suggested by the Court on its own motion.

After the jurisdictional defect was discovered, the Court decided to afford the parties an opportunity to submit jurisdictional briefs before reaching a final decision. Accordingly, on November 3, 1965, the Court entered an order which set forth the jurisdictional problem and directed the parties to file briefs on or before November 17, 1965. The issue has been re-examined upon the basis of the briefs of the parties filed in response to the Court's order, and upon the entire record.

Before analyzing the case law, it is necessary, because of the complexity of the concepts here considered, to begin by setting out a general framework of propositions which are considered basic to the discussion.

(1) This Court, being a federal court, has only limited jurisdiction. Consequently, 28 U.S.C.A. § 1332(a), which confers diversity jurisdiction upon district courts, has been narrowly construed. Under the statute, this Court has jurisdiction over the controversy presently before it only if "the matter in controversy * * * is between citizens of different States." The statute makes determinative the actual matter in controversy.[1] Matters which the executors would *like* to adjudicate in this proceeding, but which are not actually before the Court, have no bearing on the Court's jurisdiction.

(2) At every stage of the proceeding, the burden remains upon the

---

1. Since the claim which is presented in this suit is not an independent claim belonging to the plaintiff, but is a claim belonging only to the executors, it would be possible to say that the "matter in controversy" is not between the plaintiff and the individual defendants, but between the executors and the individual defendants. This approach would disregard the citizenship of the party *assert-* *ing* the claim and would look only to the citizenship of the party *on whose behalf* the claim is asserted. It is arguable, under this approach, that the action should be dismissed for want of diversity between the executors and the individual defendants *without* realigning the executors. But since the Court is of the opinion that the executors should be so realigned, this approach is not considered.

party invoking the diversity jurisdiction of the Court to prove that jurisdiction is well founded. If this burden is not carried, the Court has the duty, on its own motion if not suggested by any party, to dismiss the action whenever the want of jurisdiction appears. See Mansfield, Coldwater & Lake Michigan Ry. v. Swan, 111 U.S. 379, 4 S.Ct. 510, 28 L.Ed. 462 (1884), in which the Supreme Court on its own motion found that jurisdiction was lacking in the court below.

■ (3) If the executors *had* brought suit in their own names, as the plaintiff demanded, they would have been the real parties in interest (Rule 17(a) F.R.Civ. P.) and the action would necessarily have been dismissed for want of diversity between the executors and the individual defendants. Coal Co. v. Blatchford, 11 Wall. 172, 78 U.S. 172, 20 L.Ed. 179 (11 Wall. 1870). Had the executors sued, it is clear that it would have been their citizenship and not that of the persons they represented which would have been controlling. Dodge v. Tulleys, 144 U.S. 451, 12 S. Ct. 728, 36 L.Ed. 501 (1892); Rice v. Houston, 80 U.S. 66 (13 Wall.), 21 L.Ed. 484 (1871); Childress v. Emory, 21 U.S. 642 (8 Wheat.), 5 L.Ed. 705 (1823); Kerrigan's Estate v. Joseph E. Seagram & Sons, 199 F.2d 694 (3rd Cir., 1952); Boston & M. R. R. v. Dutille, 289 F. 320 (1st Cir., 1923); New York Evening Post Co. v. Chaloner, 265 F. 204 (2d Cir., 1920), petition for cert. dismissed, 252 U.S. 591, 40 S.Ct. 396, 64 L.Ed. 731 (1920); Lang v. Elm City Construction Co., 217 F.Supp. 873 (D.Conn.), aff'd, 324 F.2d 235 (2d Cir., 1963). The rule appears to be the same in this circuit, Memphis St. Ry. Co. v. Bobo, 232 F. 708 (6th Cir., 1916), aff'd 243 U.S. 299, 37 S.Ct. 273, 61 L.Ed. 733 (1917). See also, Suders v. Campbell, 73 F.Supp. 112 (M.D. Pa., 1947); Popp v. Cincinnati H. & D.

Ry. Co., 96 F. 465 (S.D.Ohio, 1899); Wade v. Sewell, 56 F. 129 (D.Md.1893); and Shirk v. City of La Fayette, 52 F. 857 (D.Ind., 1892). Finally, according to Hart & Wechsler, The Federal Courts and the Federal System, p. 917, "When a fiduciary is a proper party to sue or be sued, the Court looks to his citizenship and not that of the beneficiaries, or of a decedent."

■ (4) It is the duty of a federal court, for diversity purposes, to realign the parties as their interests demand. Hamer v. New York Railways Co., 244 U.S. 266, 37 S.Ct. 511, 61 L.Ed. 1125 (1917); City of Dawson v. Columbia, etc., Trust Co., 197 U.S. 178, 25 S.Ct. 420, 49 L.Ed. 713 (1905) (Holmes, J.); Dilatush v. Highfill, 140 F.2d 741 (8th Cir., 1944), cert. denied, 322 U.S. 742, 64 S.Ct. 1145, 88 L.Ed. 1575; Farr v. Detroit Trust Co., 116 F.2d 807 (6th Cir., 1941); Staten v. Louisville Trust Co., 28 F.Supp. 301 (W.D.Ky., 1939). Also,

> jurisdiction is defeated, even though diversity appears from the plaintiff's alignment of the parties, if the facts of the case show that the alignment does not conform to the real interests of the parties, and the proper alignment shows that the requisite total diversity does not exist. 3 Moore's Federal Practice (2d ed.) § 19.03[1].

And, "[t]he rule is the same where one whose interest lies with the plaintiff is made a party defendant because of its refusal to sue." Grant County Deposit Bank v. McCampbell, 194 F.2d 469, 471 (6th Cir., 1952).

(5) This being so, if the executors had refused to bring suit, but had remained entirely neutral (as they should have done, and as the plaintiff at any time by objection could have forced them to do),[2] their actual interests, the fact that no re-

---

**2.** No motion was made by the plaintiff to strike the portions of the executors' answers which contested the allegations of the plaintiff's complaint. Similarly, no motion was made to quash, the interrogatories propounded by the bank to the plaintiff. At one point in the trial, however, the bank's attorney objected to the introduction of certain documentary evidence. The plaintiff's attorney requested the Court to deny the objection on the ground that the bank should not be permitted to oppose its own cause of action. The Court indicated that the position of the bank was inconsistent with the interests of the estate, but re-

lief was asked from them,[3] and their lack of active hostility to the plaintiff would have required that they be realigned as plaintiffs and the action dismissed for want of diversity. In other words, if, before the executors filed their answers, the individual defendants had moved to realign them and dismiss for want of diversity, the motion would have been well founded.

The plaintiff in her jurisdictional brief does not seriously challenge these propositions. We begin, then, with the understanding that at least at one stage of the litigation, if the jurisdictional defect had been noticed, the Court would have been *required* to realign the executors as plaintiffs. The only issue actually in dispute is whether or not the executors, on the facts of the present case, in view of their antagonism to plaintiff's claim demonstrated throughout the trial, should be realigned as plaintiffs.

Of course, the executors were named as defendants for procedural reasons only. The fact alone that no relief is sought from them is a strong indication that the executors should be realigned as plaintiffs. See Steele v. Culver, 211 U.S. 26, 29, 29 S.Ct. 9, 53 L.Ed. 74 (1908) (Holmes, J.), "the omission of any prayer for relief against the railroad simply shows that properly it is to be treated as a plaintiff in this case." Brown v. Denver Omnibus & Cab Co., 254 F. 560 (8th Cir., 1918). Furthermore, the plaintiff does not allege any breach of fiduciary duty on the part of the executors. If the plaintiff is successful in her first cause of action, a valuable interest in the partnership will be reconveyed to the executor. In fact, the right which the plaintiff asserts is not her own, but that of the executor. This is admitted in the

plaintiff's pre-trial brief ("This cause of action is not asserted *against* the estate or its Executor, but, rather, *on behalf* of the estate and its Executor. * * *" Emphasis in original). Plaintiff's attorney stated at trial:

> We are not asking the bank for any money. * * * We are not asking relief from the bank in this case. * * * We are not suing the bank. No relief is sought from them. We didn't bring an action to surcharge the bank for failure. If we should get the asset back, it goes back to the estate.

Also, plaintiff's attorney stated at trial:

> no judgment is sought against the bank, I think if you will look at Paragraph 12 of the complaint, you will find that the bank is in the same capacity as a derivative plaintiff. It is a party named by requirement of law. It is not a real party. Under the law they had the right to assert this cause of action. When they failed to assert it, we are asserting it in their name. The bank is for all purposes a party plaintiff rather than a party defendant. We have been a little shocked by the bank taking the position of defense.

In Blacklock v. Small, 127 U.S. 96, 104, 8 S.Ct. 1096, 1099, 32 L.Ed. 70 (1888), the Court ruled that since the suit was "substantially by and for the benefit" of one of the named defendants, that defendant should be treated as a plaintiff and the case dismissed for want of diversity.

It thus appears from the nature of the claim asserted in the complaint and the relief sought, and from the plaintiff's own admissions, that the executors' real interests in this suit are identifiable with

---

served ruling. Since the bank's objection was not renewed, a final ruling was not made. Had the parties pressed the issue, it is probable that the present jurisdictional defect would have been brought to the attention of the Court and the parties at that time.

3. The plaintiff in her jurisdictional brief takes the position that she has asked

for relief against the bank in that the bank might be compelled to accept and administer any reconveyed assets of the estate. This position is untenable, for the reason that a reconveyance of assets to the bank would not, in any realistic sense, be relief against the bank but would, rather, be an enforcement of the bank's cause of action.

the side of the plaintiff rather than with the side of the individual defendants.

If the above propositions are correct, the Court's jurisdiction would be based not on the *interests* involved, but would exist solely because the executors have *voluntarily chosen* to be antagonistic, rather than to remain neutral. Jurisdiction, in other words, would be determined not by interests but by attitudes and conduct.

■■ In this respect, it should be remembered that the parties cannot confer diversity jurisdiction upon the Court by consent or waiver, either express or implied. Mansfield, Coldwater & Lake Michigan Ry. v. Swan, supra. Nor is the Court's jurisdiction to be determined by the plaintiff's choice of which parties to join as plaintiff and which as defendant. Whether or not a federal court's jurisdiction is to be determined by the executors' *attitude* toward the plaintiff's action is the question to be decided in this case.

The proper resolution of the issue depends, primarily, upon what the Court conceives to be the correct rule to be applied: an executor who is an indispensable party,[4] and whose right the plaintiff asserts derivatively against a third person because of the executor's refusal to sue, should not by virtue of his hostile attitude toward the plaintiff's claim compel the Court, for diversity purposes, to treat him as a defendant *unless* his hostile attitude is reasonably required by the matters in controversy in support of some legitimate interest of the estate he represents.

If there is no "matter in controversy" between the executors and the plaintiff, then the executors' hostile attitude would not be required. Similarly, if the executors' hostile attitude is unrequired, the fact that their hostile attitude gives rise to hostile conduct is immaterial. Such hostile conduct would be no more required by or responsive to the matters

actually in controversy than would be the executors' hostile attitude. As we have seen, if, after the complaint was filed and before the executors had filed answers or engaged in any hostile conduct, the individual defendants had moved to dismiss for want of diversity, it would clearly appear that jurisdictional realignment would have been required, for at that stage, the *only* reason for *not* realigning the executors as plaintiffs would have been their mere refusal to sue, and, as we shall see, that is not reason enough.

■ If the hostile attitude of an executor bearing no relationship to the interests of the estate is the test to determine its alignment, a federal court's jurisdiction would depend upon the mere whim or caprice of the executor. Under such a test jurisdiction once existing might be defeated merely by a change of attitude on the part of the executor. It seems obvious in such a case that a more objective standard should prevail. Antagonistic attitude and conduct of an executor should be significant for jurisdictional purposes, only if required by, or responsive to the relief sought in the plaintiff's complaint, or if necessary to advance or promote some valid interest of the estate on whose behalf the claim is asserted. Only then are such attitude and conduct expressive of objective interests which are not likely to be changed. No sufficient reason appears why the executors in this case should be able to confer otherwise non-existent jurisdiction simply by their decision to engage in hostile conduct which is not only not responsive to the relief sought but is actually inconsistent with the interests of the estates they represent.

Within this framework, we may now proceed to examine the jurisdictional briefs filed by the plaintiff and the individual defendants. No jurisdictional briefs were filed by the executors.

The plaintiff's brief attempts to distinguish all of the cases cited in the

---

4. The executors are indispensable because it is their claims which the plaintiff is asserting. Also, any recovery goes to the executors and not to the plaintiff individually. Finally, their joinder as parties is further required in order to render the claims *res judicata*.

Court's order of November 3, 1965, upon the ground that none of those cases involved a situation where the realigned party had demonstrated any antagonism or hostility to the success of the plaintiff's claim. That is true, but in the Court's view antagonism and hostility are irrelevant on the facts of this case.

In support of the broad assertion that the executors' antagonistic attitude should be determinative of their alignment, plaintiff cites nine cases:

Green v. Green, 218 F.2d 130 (7th Cir., 1954), cert. denied, 349 U.S. 917, 75 S.Ct. 606, 99 L.Ed. 1250 (1955) involved in action for an accounting by Texas beneficiaries of a trust against an Illinois trustee. The trustee's wife, also an Illinois citizen, was named as a defendant because even though she too was a beneficiary she refused to join in the suit against her husband. No relief was sought from the wife. The trustee moved to dismiss for want of diversity between himself and his wife. The district court overruled this motion. The trustee appealed and the Circuit Court, in a 2–1 opinion on the realignment point, affirmed.

It is crucial to note that the two judges who felt that the wife should not be realigned as a plaintiff first ruled that the wife was not an indispensable party, that the suit could be dismissed as to her, and that, for diversity purposes, her presence in the suit did not even have to be considered by the district court.[5] Having so ruled, the Court's further statement that the wife should not be realigned even if she were indispensable, is more dictum than ruling. It is not unreasonable to limit Green to this holding. In fact, in Seigler v. American Surety Co., 151 F.Supp. 556, 558 (N.D. Calif., 1957), a district court cited Green for the proposition that:

It is fundamental that where several parties are joined in an action, the residence of parties not indispensable to the action may be disregarded by the Court, and those parties dismissed, if it is necessary in order for the Court to retain jurisdiction based on the diversity of citizenship between the indispensable parties to the action.

In the present·case, the executors are indispensable, and apart from their presence in this suit, the plaintiff has no cause of action against the individual defendants. In Green, however, the plaintiff had an independent, non-derivative right against the trustee which was entirely non-dependent on the presence of the other contingent beneficiary. This analysis suggests that Green is neither controlling nor persuasive with respect to the issues before the Court. It is true that there is language in Green which could be taken as support for the plaintiff's position. The two judges considered the wife's hostile attitude to be of importance. Her conduct, too, was of importance in that she joined in the trustee's answer in denying any wrongdoing on his part, prayed for dismissal of the complaint, and joined the trustee in a counterclaim against the plaintiff. Although the point is not made in the opinion, it is possible that the wife was, in a real sense, subject to the control of her defendant husband with respect to her position in the litigation.

Circuit Judge Schnackenberg, dissenting in part, was of the opinion that the wife was an indispensable party, that she should be realigned as her interests demanded with the other beneficiaries, and that the suit should be dismissed for want of diversity. Judge Schnackenberg noted that,

The omission from the amended complaint of any prayer for relief against Madge [the wife], who is named as a defendant thereto, is significant. It tends to show that she is properly to be treated as a plaintiff. * * * Her interest in the Martha Green trust is the basis for joining her as a party. That she may have a sympathetic interest in

---

5. Again, it is noted that the plaintiff does not claim that the executors in this suit are not indispensable parties.

her husband's defense * * * does not constitute such an interest as would be determinative on the question of realignment of the parties herein. (Green, supra 218 F.2d at p. 139).

Judge Schnackenberg apparently was of the view that Madge's hostile attitude, since unresponsive to the matter in controversy, should not be determinative of her alignment and, hence, of the Court's jurisdiction. He also thought it important that there was no allegation that the wife had participated in the alleged misconduct of her husband. Each of Judge Schnackenberg's reasons would support realignment of the executors in the present case. No relief is sought from them, they have no interests in common with the individual defendants, and they are not alleged to have participated in the wrongdoings of the individual defendants.

The plaintiff cites Hamer v. New York Rys. Co., 244 U.S. 266, 37 S.Ct. 511, 61 L.Ed. 1125 (1917) for the proposition that the defendant's "attitude" is determinative of his alignment. There is language to that effect in Hamer, but it should be noted that the Court realigned a trustee as a plaintiff, in part, because of his attitude in praying that the relief asked by the plaintiff be granted, and then dismissed for want of diversity between the trustee and the individual defendants. The Court ruled that the trustee's *mere refusal to sue* was *not* a sufficient reason for aligning the trustee as a defendant, as named. Because of the holding in Hamer, the language in that opinion which the present plaintiff relies upon cannot be considered to be much, if any, support for the plaintiff's position. Furthermore, in one sense, the trustee's *attitude* was *not* determinative since the trustee, if given his option, would have preferred to be and remain a defendant. The Hamer decision, upon analysis, turns not so much upon the trustee's attitude as upon the trustee's *interest* in the litigation. The Court found that "among other things" the trustee's request that the plaintiff be granted relief as prayed made it clear that "the interest of the Trust Company in this controversy lies wholly with the plaintiffs." (p. 274, 37 S.Ct. p. 514). The Court did not specify what "other things" required the trustee's alignment as a plaintiff. Probably the most significant factor would be the fact that any recovery would go not to the plaintiff, but to the trustee. In other words, even if the trustee had *not* prayed for the relief asked by the plaintiff, but had remained entirely neutral, the Court probably, because of the trustee's real interests, would have realigned the trustee as a plaintiff. This case, then, offers little support for the plaintiff's position, and can, indeed, be cited as support for realignment.

In Sutton v. English, 246 U.S. 199, 38 S.Ct. 254, 62 L.Ed. 664 (1918), several heirs brought suit to set aside testamentary dispositions so that certain property would pass to them under intestate succession. One of the heirs refused to join in the suit and was named a defendant. The Court below realigned the defendant heir as a plaintiff since she, too, would benefit equally with the other heirs, and dismissed for want of diversity between the realigned heir and the individual defendants, and for other reasons. The Supreme Court ruled that such realignment was improper and that "she was properly made a party defendant, that being her attitude towards the actual and substantial controversy." (p. 204, 38 S.Ct. p. 256). It is crucial to note that the defendant heir in Sutton was also the *sole legatee* of the will which was being attacked. If the suit were successful, she would share equally with several other heirs; if the suit were unsuccessful, she would take the entire legacy. Obviously, she had a real and substantial *interest* in opposing the suit. She would gain less by a successful prosecution than by a successful defense. In *this* situation, it would appear to be proper, if not necessary, to examine not only her interests, but her attitude. But in the present case, the estates which the executors represent can benefit only

through a successful prosecution. The executors have no bona fide *interests* in opposing the suit. Consequently, their attitudes toward the suit should have no bearing upon their proper alignment.

Plaintiff cites Hotel Company v. Wade, 97 U.S. 13, 24 L.Ed. 917 (1877) as authority for the proposition that the courts have repeatedly sustained the alignment as a defendant of any party who has demonstrated even the slightest antagonism to the plaintiff's case. Upon analysis, it will be seen that Wade stands, rather, for the proposition that the courts have sustained the *joinder* as a nominal defendant of any party who could sue as a plaintiff, but who has refused to sue on his own behalf. Wade was not at all concerned with the proper *alignment* of the parties. Indeed, the question was not raised by the parties or discussed by the Court. The Court was concerned only with the prior, and fundamental question of whether or not the trustee could be joined as a party at all. The defendants challenged the lower court's jurisdiction on the ground that the trustee, not the bondholders, was the proper party to bring suit. The defendants contended that since the trustee had not joined as a plaintiff, and since, as they urged, "the practice of courts of general jurisdiction, where those who refuse to join as complainants may be impleaded as defendants, cannot obtain in the Circuit Court of the United States," (p. 15), the Court did not have jurisdiction for want of an indispensable party. The question before the Court in this early case was not whether the trustee could be realigned, but simply whether he could be joined. Consequently, this case does not support the plaintiff's proposition.

Hirsch v. Stone, 62 F.2d 120 (5th Cir., 1932), cert. denied, 289 U.S. 747, 53 S. Ct. 691, 77 L.Ed. 1493 (1933) is cited for the proposition that mere refusal to sue is sufficient reason to align the trustee as a defendant. In Hirsch, the Circuit Court stated,

> Further, though jurisdiction cannot be conferred by the collusive, col-

> orable refusal of a trustee with title to sue [citing Hamer], neither can it be defeated by realigning with plaintiffs a trustee sued as defendant, who though he should be on the same side with plaintiffs, has taken a position antagonistic to them, and has refused to act in their behalf. (62 F.2d p. 122)

Admittedly, this is strong language for the plaintiff's position. It loses much of its impact, however, when considered in the context of the facts before the Court. Before making the above statement, the Court first ruled that the District Court erred in realigning the trustee as a plaintiff, for the reason that, by Texas law, the trustee was not a necessary or indispensable party to the suit. In other words, the trustee's citizenship was immaterial since the plaintiffs could have brought suit in their own names without even joining the trustee as a party. That, of course, is not the present case. Here, the executors' citizenship is material, and it is necessary to consider their proper alignment. In Dollar S. S. Lines v. Merz, 68 F.2d 594 (9th Cir., 1934) the plaintiff brought a tort action against several defendants and joined the defendants' agents as joint wrongdoers. There was no diversity between the plaintiff and the agents. The District Court apparently thought with the plaintiff that the citizenship of the agents was immaterial. The defendants appealed on this point and the Circuit Court reversed for want of diversity.

> The cases relied upon by appellee involved parties who had no real interest in the controversy. See, for example, * * * Hirsch v. Stone. (p. 594)

Merz was not a realignment case, but it is clear that the Ninth Circuit read Hirsch as a case concerned only with a trustee who had no real interest in the controversy. Consequently, the broad language in Hirsch should be construed to apply only to a situation where the party sought to be realigned is not an indispensable party.

Hellenthal v. John Hancock Mut. Life Ins. Co., 31 F.2d 997, 998 (D.C.Wash., 1929) is cited by the plaintiff for the argument that, "[w]here the conduct of the party is shown to be antagonistic to the plaintiff and makes common cause and interest with the defendant, the court may not align the party as a plaintiff." This case involved a suit by a beneficiary against an insurance company to recover upon a policy of life insurance. A Savings & Loan Association, which was an assignee of the policy, refused to join in the suit and was named as a defendant. The case was removed to the District Court on the basis of diversity between the plaintiff and the insurance company (treating the Association as a plaintiff). The plaintiff then moved to remand for lack of diversity between the plaintiff and the Association. The District Court ruled that the Association was properly made a defendant, thus defeating diversity. A crucial factor here is that the Court found that the Association and the insurance company maintained extremely close business relationships, often acting as the agent for each other, and that the Association may have been under the antagonistic control of the insurance company. This case, which was decided in 1929, has been cited only once, and the citing case, Broidy v. State Mutual Life Assur. Co., 87 F.Supp. 271 (E.D.N.Y., 1949), relied upon the antagonistic control factor to distinguish Hellenthal. In Broidy, the Court disregarded the fact that a loan association had, by answer, denied a material allegation of the plaintiff's complaint, and relied instead upon the fact that "the loan association has nothing to win by defeating the plaintiff's cause, but stands to gain in the event of her success." (p. 272). It appears that the Court in Broidy felt that the loan association in Hellenthal, by virtue of its close and continuing business relationship with the insurance company, could lose more, in the long run, by joining with the plaintiff, than it could recover as assignee of the policy. If this is so, the loan association in Hellenthal, would have had a real financial *interest* in op-

posing the suit. Furthermore, the procurement of the policy and its assignment to the Association were made as *additional* security for the loan which the Association made to the deceased. Hellenthal, 31 F.2d p. 997. It appears, then, that the Association was protected through other security, and the Association's financial interests did not necessarily require recovery against the insurance company on the policy. In the present case, however, the estates of Mr. and Mrs. Cuneo are not protected through additional security, and such claims as they may have can be enforced only through an action brought by or on behalf of the executors.

The next case cited by the plaintiff is Pavek v. Ranchers Fur Auctions, 214 F. Supp. 802 (E.D.Wis., 1963). A Wisconsin citizen sued a Wisconsin auctioneer and the auctioneer's foreign insurer for destruction by fire and theft of mink pelts consigned to the auctioneer. The theories of recovery were slightly different. Plaintiff sued the auctioneer on the basis of a contractual agreement between the plaintiff and the auctioneer whereby the auctioneer contracted to procure insurance against loss of pelts consigned to him. Plaintiff sued the insurance company as a third-party beneficiary of the contract between the insurance company and the auctioneer. The auctioneer filed a cross-complaint asking for relief from the insurance company *in the event* the plaintiff should recover from the auctioneer. For purposes of the cross-complaint *only*, the auctioneer adopted the plaintiff's complaint. The insurance company claimed that the auctioneer and the plaintiff should be aligned on the same side, since their interests were substantially similar, thus supporting diversity jurisdiction. The Court refused to realign the auctioneer. The case appears to be correct, but clearly distinguishable. There was an actual dispute between the plaintiff and the auctioneer, and the auctioneer contested both the loss, and his liability for the loss. The plaintiff was asking for relief from the auctioneer, and the plain-

tiff's claim was not derived through the auctioneer, but was an independent claim. Finally, had the auctioneer chosen not to file a cross-claim against the insurer, the auctioneer and the plaintiff would have had *no* interests in common. That is not the present case. In Pavek, the Court, in effect, ruled that the auctioneer's voluntary choice to align himself, in a sense, with the plaintiff by filing a cross-claim against the insurer, should not be determinative of his proper alignment. Similarly, in this case, the executors' voluntary choice to align themselves against the plaintiff should not be determinative of their proper alignment. Furthermore, it should be noted that the only authority cited in Pavek for non-realignment was Green v. Green, which, we have seen, is no authority under the facts of the present litigation.

Finally, plaintiff refers to the "analogous area of the derivative stockholder suit" and cites Smith v. Sperling, 354 U.S. 91, 77 S.Ct. 1112, 1 L.Ed.2d 1205 (1957), and, decided on the same day, Swanson v. Traer, 354 U.S. 114, 77 S. Ct. 1116, 1 L.Ed.2d 1221 (1957) for the proposition that mere refusal to sue constitutes a "real collision of issues," or an "actual controversy" (Sperling, 354 U.S. p. 97, 77 S.Ct. 1112) between the shareholder and his corporation, and thus requires the alignment of the corporation as a defendant.

In Hamer v. New York Railways Co., 244 U.S. 266, 274, 37 S.Ct. 511, 514, 61 L.Ed. 1125 (1917), which was not mentioned in either Sperling or Swanson, the Court ruled:

> It is not contended that this refusal to sue makes the Trust Company an adversary, to be classed for purposes of jurisdiction with the real defendants—as in those cases where the refusal to sue was part of a fraudulent participation in the wrongdoing, and where the trustee or corporation in effect ranged itself in opposition to the relief sought. The Trust Company having, as we have shown, a real interest in the controversy, which makes it a necessary party to the suit, must be aligned as a party plaintiff, where its interest lies.

Unless we are to construe Sperling and Swanson as *sub silentio* overruling this long-standing rule for trustees and other fiduciaries, the plaintiff's proposition is without merit. For the reasons which follow, the Court is of the opinion that Sperling and Swanson should not be so read, but should be limited to a jurisdictional rule for corporate derivative suits.

These 5–4 decisions, as pointed out in Justice Frankfurter's cogent dissent, establish rather mechanical tests for determining federal jurisdiction over corporate derivative suits. The majority ruled that "the proper course is not to try out the issues presented by the charges of wrongdoing but to determine the issue of antagonism on the face of the pleadings and by the nature of the controversy." (Sperling, 354 U.S. p. 96, 77 S. Ct. p. 1115). Of course, if the Court is to look no further than the pleadings, then Sperling must be read as overruling, *sub silentio*, hundreds of reported cases, among them being City of Dawson v. Columbia etc., Trust Co., 197 U.S. 178, 180, 25 S.Ct. 420, 49 L.Ed. 713 (1905) (Holmes, J.), and City of Indianapolis v. Chase National Bank, 314 U.S. 63, 69, 62 S.Ct. 15, 86 L.Ed. 47 (1941), which held that it is the duty of a federal court to look beyond the pleadings and align the parties as their interests demand. But Sperling need not be read in this way. The majority in Sperling was concerned by the fact that the court below had required a fifteen day hearing to determine the proper alignment of the corporation, and the Sperling reference to the "face of the pleadings" must be construed in that context. At any rate, the last part of the test announced in Sperling depends upon the "nature of the controversy" and this phrase is sufficiently broad to enable district courts to align parties as their interests demand, even without looking beyond the pleadings. The majority went on to rule that,

Whenever the management refuses to take action to undo a business transaction or whenever, as in this case, it so solidly approves it that any demand to rescind would be futile, antagonism is evident. The cause of action, to be sure, is that of the corporation. But the corporation has become through its managers hostile and antagonistic to the enforcement of the claim. Sperling, 354 U.S. p. 97, 77 S.Ct. p. 1115.

Unless the corporation and its management are presumed, for all purposes, to have *identical interests*, the manner in which the corporation "through its managers" becomes hostile and antagonistic to the corporation's own claim, is difficult to comprehend.

At any rate, even if it may be presumed that the corporation has no interests separate from the interests of its management (which, of course, would destroy the theoretical justification for derivative suits), it should be noted that the executors in the present case have identifiable interests which are not only separate from the interests of the individual defendants, but which are clearly opposed thereto.

Similarly, in Swanson, the majority stated:

The management is, therefore, antagonistic to the stockholders as that conception has been used in the cases. It follows that the corporation was properly made a defendant. (354 U.S. p. 116, 77 S.Ct. p. 1118).

Again, this proposition would not appear to "follow" unless the interests of the managers and directors, who are generally the individual defendants, are presumed to be identical to the interests of the corporation.

Strictly speaking, Sperling and Swanson held only that mere refusal to sue demonstrates an "actual controversy" between the *management* and the shareholder, and that *because* the corporation is controlled by the management the refusal of the *management* to sue further demonstrates, in some unexplained manner, an "actual controversy" between the *corporation* and the shareholder. In the present case, the individual defendants are clearly hostile to the plaintiff, but they do not in any sense *control* the executors, and there is no "actual controversy" between the executors and the plaintiff. In the corporate derivative suit, the persons who refuse to sue are also the individual defendants, whereas in the present case, the persons who refused to sue are not the individual defendants, and are not even alleged to have participated in the wrongdoings of which the plaintiff complains.

Justice Frankfurter's dissent sets out several reasons why the majority decisions in Sperling and Swanson may not be correct, even in the context of *corporate* derivative suits. But assuming, as the Court of course must, that those decisions represent the correct law of the land for corporate derivative suits, the Court is of the opinion that the rule should not be extended to non-corporate situations.

A corporation is not a fiduciary. It is under no obligation to enforce its own rights. But executors are fiduciaries, and they are under strict obligations to protect and enforce the rights of the estates which they represent. Consequently, the reasons which would permit a corporation to defend a suit brought on its behalf would not necessarily be sufficient to permit executors to defend suits brought on behalf of their estates.

A corporation often has valid interests which oppose the enforcement of its own claim. For example, the corporation may lose more through harmful publicity than it would gain through a successful suit. Or, since the corporation will frequently have to pay the costs of a successful defense, the corporation may stand to lose financially if the shareholder loses. Finally, since the defendants in corporate derivative suits are generally the

officers and directors of the corporation, the corporation may feel that the disruptive effect on long-range corporate management may more than outweigh the possible benefits of a successful suit. All of these reasons represent valid corporate *interests* which may be opposed to the shareholder's suit. Not one of these reasons applies to a suit brought on behalf of an estate. Of course, in some cases it might be shown that estates have valid interests which are opposed to the suits brought on their behalf, but in the present case no such showing is made.[6] There is hostility, to be sure, but it has not been the hostility of executors, but of individuals. The executors' hostility has been motivated not by the interests of the estates, but by *personal* considerations, and such considerations should not be determinative of this Court's jurisdiction over a suit brought on behalf of the estates which they have a fiduciary duty to represent.

Alignment of the executors as defendants might be proper where valid interests of the estate are shown to be opposed to the suit. But the personal opposition of the executors, unrequired by the interests of the estates, and, indeed, directly opposed thereto, as in this case, will not suffice.

For these reasons, the Court is persuaded that the rule of Sperling and Swanson should not be extended to suits which are brought on behalf of fiduciaries.

We turn now to an examination of the jurisdictional brief filed by the individual defendants which reads, in part, as follows:

While these defendants would prefer that the Court decide this suit on the merits, they recognize that such a decision would be meaningless if the Court has no jurisdiction. In view of this fact, defendants have studied carefully each of the cases cited in the Court's order and have concluded that the Court's indicated position is a sound one and a decision of the case on the merits would not be binding on either of the parties.

The individual defendants cite the following cases as support for realignment of the executors: Niles-Bement-Pond Co. v. Iron Moulders Union, 254 U.S. 77, 41 S.Ct. 39, 65 L.Ed. 145 (1920); Kentucky Natural Gas Corp. v. Duggins, 165 F.2d 1011 (6th Cir., 1948); Schuckman v. Rubenstein, 164 F.2d 952 (6th Cir., 1947); Berg v. Merchant, 15 F.2d 990 (6th Cir., 1926), cert. denied, 274 U.S. 738, 47 S.Ct. 575, 71 L.Ed. 1317 (1927); Gable v. Vonnegut Machinery Co., 274 F. 66 (6th Cir., 1921); Davis v. Henry, 266 F. 261 (6th Cir., 1920). These cases, however, do not address themselves to the particular problem before this Court (that is, the jurisdictional effect of the executors' unrequired hostility to the plaintiff's action) and, for that reason, they need not be analyzed in this opinion.

Plaintiff has set forth two possible reasons for aligning the executors as defendants. First, because of their hostile *conduct*. And second, because of their hostile *attitude*. Neither of these reasons is sufficient to override the interests which they, as fiduciaries, are presumed to represent.

The plaintiff has pointed to the numerous ways in which the executors, and especially the bank, have engaged in hostile conduct: by denying the alle-

6. At trial, upon being pressed by the Court, the bank's attorney was able to state only two reasons why the bank should be permitted to defend a suit brought on its behalf. First, the bank felt it "had some obligation to these purchasers [the individual defendants] to protect their interest. * * *" And second, the bank feared the possibility of a future mismanagement suit and thus wanted to have determined in this action that the price received by the bank was a fair price. Of course, the bank as executor has no obligation to defend the individual defendants; such defense would impede rather than advance the interests of the estate. Furthermore, the estate has no interest here in protecting the bank from a future mismanagement suit.

gations of the plaintiff's complaint, by propounding interrogatories to the plaintiff, in objecting to testimony, in arguing points of law, in having the bank's trust officer testify in support of the individual defendants' position, and in numerous other ways. Such conduct is inexplicable in view of the position of the executors as fiduciaries, but, in the Court's opinion, it is not determinative of the jurisdictional issue. On the record before the Court such conduct represents the personal and unrequired attitude of the executors individually and not the attitude which should have been assumed in their capacities as fiduciaries of decedents' estates. It goes less to the merits of the present case than to the merits of a mismanagement suit against the executors.

The executors' hostile attitude, though unjustifiable as far as the present record shows, has in no way hindered the plaintiff's suit. In fact, were it not for the executors' reluctance to sue, they, not the plaintiff, would be the parties asserting these claims, and this Court would clearly have no jurisdiction of such an action. Especially when the nominal defendants, as here, are fiduciaries, will the Court presume that their interests coincide with the interests of the decedents' estates. It will take more than a showing of personal, hostile attitudes to displace this presumption.

The Court is of the opinion that the ruling herein is compelled by sound reason and by the dictates of limited jurisdiction as expressed in analogous areas of case law.

Consequently, the Court has the duty to realign the executors as plaintiffs, as their interests demand, thus defeating diversity jurisdiction. This disposition achieves the result which would have been necessary had the executors accepted the plaintiff's demand to bring suit, or had a motion to realign and dismiss been interposed at the outset of the litigation.

Judgment will be accordingly entered dismissing the action for the reasons herein set forth.