Martha Cuneo REED, Plaintiff,

v.

Albert F. ROBILIO, Mrs. Jennie G. Robilio, John S. Robilio, Rose Ann Robilio, Florence Rita Robilio Radogna, Union Planters National Bank of Memphis, Tennessee, and Roane Waring, Jr., Defendants.

Civ. A. No. 4404.

United States District Court
W. D. Tennessee, W. D.

Sept. 13, 1967.

See also D.C., 248 F.Supp. 602.

Robert Fiske, Jr., of Davis, Polk, Wardwell, Sunderland & Kiendl, Leo Kissam, of Kissam & Halpin, New York City, and Walter Chandler, of Chandler, Manire & Chandler, Memphis, Tenn., for plaintiff.

Jack Petree, of Evans, Petree, Cobb & Edwards, Memphis, Tenn., for defendants Robilios & Radogna.

Marion S. Boyd, of Canada, Russell & Turner, Memphis, Tenn., for defendant-executor, Union Planters Nat. Bank.

W. B. Rosenfield, of Rosenfield, Borod, Fones & Bogatin, Memphis, Tenn., for defendant-executor, Roane Waring, Jr.

## OPINION

WILLIAM E. MILLER, District Judge.

This action was brought by Mrs. Martha Cuneo Reed against Mrs. Jennie G. Robilio, Albert F. Robilio, John S. Robilio, Jr., Rose Ann Robilio, Florence Rita Robilio Radogna, Roane Waring, Jr., and the Union Planters National Bank of Memphis, Tennessee. The plaintiff is a resident of the State of New York and the defendants are all residents of the State of Tennessee. Jurisdiction is based upon diversity of citizenship.

The plaintiff is the daughter of Thomas A. Cuneo and Zadie S. Cuneo, both deceased, who were partners of Albert Robilio and the late Mrs. Jennie G. Robilio in the firm of Robilio & Cuneo. The other Robilio defendants are brothers and sisters of Albert F. Robilio. The Union Planters National Bank is the executor of Thomas A. Cuneo's estate, and Roane Waring, Jr., was named a defendant in his capacity as co-executor of Mrs. Cuneo's estate.

In the first cause of action, the plaintiff sues on behalf of the executor of her father's estate, and seeks to impose a constructive trust upon the 30.66% interest in the firm of Robilio & Cuneo which her father owned at the time of his death. Consistent with this theory, plaintiff would have the Court order the constructive trustees to reconvey the partnership interest to the executor with an accounting for profits. The action is based on an alleged breach of the fiduci-

ary duty which a surviving partner owes to the estate of the deceased partner to disclose facts pertinent to the valuation of the deceased partner's interest.

For a second cause of action, the plaintiff sues on behalf of the executor of her mother's estate to cancel and rescind a partnership agreement between Mrs. Cuneo and the Robilio defendants executed subsequent to the sale of the 30.66% interest. This cause of action is also based upon an alleged breach of fiduciary duty owed by the Robilios to their partner, Mrs. Cuneo. Plaintiff contends that her mother was incompetent when the agreement was executed. The result, according to plaintiff, was that the partnership agreement unfairly restricted the class of persons to whom Mrs. Cuneo's interest could be transferred, and that in the event of an attempted transfer outside of the class, the Robilios would have an option to purchase the interest at book value plus 10%.

Numerous accusations of bad faith and dishonest practices have been made in the course of the trial. The Court finds it unnecessary to comment on many of these as they are not essential to the disposition of the case. However, the nature of the action does call for a brief history of the events which culminated in the present dispute.

In 1910, John S. Robilio, Sr., established a sole proprietorship for the wholesale and retail sale of Italian foods. Ten years later, he became associated with Thomas A. Cuneo to form the partnership of Robilio & Cuneo. When John S. Robilio, Sr., died in 1929, his wife Jennie G. Robilio succeeded to his 50% interest in the firm and Thomas A. Cuneo became the managing partner. About this same time, the firm expanded its business by beginning to manufacture and sell its own products under the trade name "Ronco." With the coming of the Second World War Thomas A. Cuneo entered military service and Albert F. Robilio, the son of John S. Robilio, Sr., took over the management of the business.

In 1943, Mrs. Jennie G. Robilio conveyed a 12.50% interest in the partnership to Albert F. Robilio, and Thomas A. Cuneo conveyed a 19.34% interest to his wife Zadie S. Cuneo. A new partnership agreement was executed fixing the interests of the four partners and providing that the partnership should terminate upon the death of any of the partners. The ownership of the partnership remained in the names and percentages fixed in the 1943 agreement until the death of Thomas A. Cuneo on September 30, 1959.

Thomas A. Cuneo left a will which created a marital trust for the benefit of his widow, Zadie S. Cuneo, and a residuary trust for the benefit of his daughter, Mrs. Martha Cuneo Reed. The Union Planters National Bank of Memphis was named as trustee, and upon admission of the will to probate was qualified as executor. As executor, the Union Planters National Bank, was given the following directions concerning the 30.66% interest in the partnership:

### ITEM IX

The principal asset in my estate consists of an interest in the partnership of Robilio and Cuneo. I authorize my Executor to sell this interest on whatever terms and at whatever price it deems to be to the best interest of my estate; provided, however, that this interest shall not be sold without first giving my wife an opportunity either to purchase this interest or to sell her interest on the same terms and conditions that my executor has agreed to sell my interest.

Immediately after the death of her husband, Mrs. Zadie S. Cuneo retained a Memphis attorney, Mr. Roane Waring, Jr., to represent her and her husband's estate. On the advice of Waring, and Mr. Postell Hebert, Vice President and Trust Officer for the Union Planters National Bank, Mrs. Cuneo decided not to buy the 30.66% interest from her deceased husband's estate. Thereupon, negotiations began between Albert Robilio and Postell Hebert for the purchase and sale of the 30.66% partnership interest.

In preparation for the negotiations, Hebert requested Robilio to furnish him with a financial report of the partnership as of Cuneo's death. An audit was conducted and the requested financial report was presented to Hebert along with the annual audit reports of the firm for the five years preceding 1959. In addition, Albert Robilio invited the representatives of the estate to make a personal inspection of the firm's books, records, and assets, and told them that he had directed his employees to answer any questions and furnish any information sought by the estate. Hebert, however, felt that he had all of the information which he needed to evaluate the partnership interest; he asked no questions of either Albert Robilio or the employees of the firm. On November 24, 1959, Hebert offered to sell the 30.66% interest to the Robilio family for $350,000, to be paid $150,000 in cash and $200,000 in eight annual installments. This offer was neither accepted nor rejected at that time.

On the 6th of January, 1960, Albert Robilio made a counter-offer of $317,000 to be paid $149,000 in cash and the balance in twelve annual installments. The sale was to be effective as of October 1, 1959, with the purchasers receiving the profits on the 30.66% interest from that date, and paying 6% interest on the unpaid balance from that date. The attorney for Robilio, in presenting the counter-offer explained that the bank's offer to sell for $350,000 was being rejected due to the hazards of the business, the impending condemnation of the present plant, the necessity of building a new plant, and the risks involved therein. Hebert was then advised of the method by which Robilio arrived at the figure of $317,000. Robilio had requested the firm's auditor to work out the appropriate formulae for the valuation of the partnership and of the 30.66% interest. The auditor presented four formulae and Robilio chose the one which yielded the highest value. This formula converted the 1958 partnership earnings into corporate earnings and then multiplied those earnings by 10 to arrive at the capitalized value of the firm. The value of the Cuneo interest was found by multiplying the value of the firm by 30.66%.

Ultimately, the counter-offer of the Robilio family was accepted by the bank and a bill of sale was executed in March of 1960.

Following the execution of the bill of sale, the Robilios entered into negotiations with Mrs. Cuneo for a new partnership agreement. During the period of negotiation, Mrs. Cuneo was suffering from incurable cancer, but was competent and was represented by her attorney, Roane Waring, Jr. As signed on September 9, 1960, the partnership agreement contained a provision which restricted the persons to whom the partnership interests could be assigned. On November 1, 1960, Mrs. Cuneo died. Her will was admitted to probate on November 4, 1960, and her attorney, Roane Waring, Jr. and the plaintiff, Mrs. Reed, were qualified as co-executors. By her will, she bequeathed her 19.34% interest in the firm to her daughter, Mrs. Reed. She also exercised a power of appointment given to her by the will of her deceased husband so that her interest in the remaining corpus of the marital trust was transferred to Mrs. Reed.

Following Mrs. Cuneo's death, the plaintiff made demand on the executors to bring suit on behalf of their respective estates against the defendant purchasers to compel a reconveyance of the 30.66% interest, and to reform or set aside the subsequent partnership agreement. These demands were refused, and plaintiff then filed suit in the United States District Court for the Western District of Tennessee on December 13, 1961.

The action was heard on the merits in a protracted trial resulting in a transcript of over 5,000 pages. Upon completion of the trial, however, the Court on its own motion suggested a lack of federal jurisdiction. Briefs on this issue were submitted, and on December 21, 1965, the action was dismissed for want of diversity between the executors and

the individual defendants. Reed v. Robilio, 248 F.Supp. 602 (W.D. Tenn. 1965).

On appeal, the United States Court of Appeals for the Sixth Circuit reversed and remanded the case for a decision on the merits. Reed v. Robilio, 376 F.2d 392 (6th Cir. 1967).

On July 7, 1967, the Court held a hearing for reargument by the respective attorneys. Two new developments arose out of these arguments. First, on plaintiff's motion, Roane Waring, Jr., was dismissed as a defendant to the action.[1] Second, the plaintiff charged that there existed a "scheme and conspiracy" to obtain the partnership interest at the lowest possible price. In response to a question from the bench, plaintiff named as the conspirators Albert Robilio, Roane Waring, Jr., and John T. Shea, the attorney for Robilio, but refused to include the Union Planters National Bank. However, after reviewing the evidence, the Court finds this charge to be without factual support. Accordingly, the Court will render its decision on the original complaint which was predicated upon the alleged failure of defendants to discharge the fiduciary duty owed to the deceased partner's estate.

■ In ordinary business transactions, the parties deal at arm's length. Unless fraud or misrepresentation is present, the courts will not inquire into the tactics of the parties or the measure of the bargain. As Dean Pound observed, the Anglo-American doctrine of freedom of contract implies the possibility of contracting foolishly. Pound, An Introduction to the Philosophy of Law, 167 (3d ed. 1961).

■ Nevertheless, in exceptional cases public policy requires a higher standard of morality than that of the marketplace. Meinhard v. Salmon, 249 N.Y. 458, 164 N.E. 545, 62 A.L.R. 1 (1928). In these situations, special circumstances place one party peculiarly at the mercy of the other. Although the elements of common law fraud are not necessarily present, arm's length bargaining would produce a result that is just as unconscionable. When these circumstances exist, the law designates the one party as a fiduciary to the other and imposes upon him the duty to deal in good faith. 1 Rowley, Partnership 515–516 (2d ed. 1960).

■ One of the relationships which is fiduciary in nature is that which exists between partners. Partners, by virtue of their business association, repose trust and confidence in each other. Hence, in their partnership affairs, one partner may not take any advantage of his associate. Brooks v. Martin, 69 U.S. (Wall.) 70, 17 L.Ed. 732 (1864).

■ Although death dissolves the partnership, the fiduciary relationship continues. The surviving partner retains his fiduciary duty to the deceased partner's estate. Joseph v. Mangos, 192 Iowa 729, 185 N.W. 464 (1921). Formerly, this duty precluded the fiduciary from personally dealing with the beneficiaries. However, there is no question that in Tennessee, the state whose law governs the disposition of this case, the surviving partner may purchase the interest of his deceased partner. Creighton v. Hayes, 209 Tenn. 364, 354 S.W.2d 73 (1962).

In the case at bar, the question to be decided is whether the Robilio defendants discharged their fiduciary duty in their dealings with the Union Planters National Bank.

Plaintiff construes the fiduciary duty to require the surviving partner to come

---

1. Waring had been made a party to the suit as the co-executor of the estate of Mrs. Zadie S. Cuneo. Subsequent to the institution of this action, the Probate Court of Shelby County ruled that the estate of Mrs. Cuneo was fully administered and discharged Waring. Thereupon, Waring assigned all rights of the estate to his co-executor, the plaintiff, Mrs. Martha Cuneo Reed. In light of the above, the Sixth Circuit held that Waring was no longer an indispensable party to the action.

In this same motion, plaintiff moved to substitute Albert Robilio, Victor L. Robilio and John S. Robilio for defendant Mrs. Jennie G. Robilio. Subsequent to the trial of this case, Mrs. Robilio died and Albert, Victor, and John Robilio were qualified as executors. Accordingly, the Court granted the motion and so ordered the substitution.

forward and voluntarily present to the estate all information within his knowledge which would have a bearing on the value of the partnership share. As proof of breach, plaintiff sets forth twenty matters [2] which the defendants allegedly failed to disclose to Postell Hebert, the representative of the Union Planters National Bank. The defendants' answer is that the estate had complete financial information and that Hebert knew all material facts. To substantiate this claim, the defendants allege that Albert Robilio furnished the Bank with the financial reports of the firm for the five years preceding Cuneo's death and that he told the estate's representatives to feel free to visit the plant and make any inquiries of the records and personnel. However, in rebuttal to this answer, the plaintiff cites Jackson v. Jackson, 343 Ill.App. 31, 98 N.E.2d 169, 176 (1951), in which the Illinois Appellate Court stated:

> * * * the duty of a fiduciary to account is not discharged by submitting books of account, no matter how voluminous; nor is it discharged by the voluntary submission of those books to numerous accountants' examinations, no matter how searching. The fiduciary's duty requires that he go further and disclose all the facts within and outside the records which bear on the deceased partner's interest.

■ The Court is of the opinion that plaintiff's reliance upon *Jackson*, supra, is misplaced. The conduct required to discharge the fiduciary duty cannot be sketched so finely. What constitutes good faith in one case may be clearly lacking when the circumstances are changed. In *Jackson*, the surviving partner was dealing directly with the deceased partner's widow. Although he did submit the books of account, he failed to disclose to her that an account carried in the name of another was really an asset belonging to her husband. Thus, the Illinois court was quite correct in its ruling that the mere submission of the books in such a context did not discharge the duty of good faith. The books affirmatively misrepresented the true state of affairs.

■ The imposition of the fiduciary duty upon a partner reflects equity's concept of justice. However, consistent with the principles of equity, the range of relationships which may entail fiduciary obligations is malleable. In his treatise on trusts, Bogert explains that,

> [T]he exact limits of the term "fiduciary relation" are impossible of statement. Equity refuses to bind itself

---

2. These matters are: (1) that the business had good will; (2) that the name "Ronco" was a well-regarded name in the macaroni business; (3) that the product had good consumer acceptance and demand; (4) that considerable sums had been expended on a successful advertising campaign; (5) that the only products which had been advertised were Ronco products; (6) that the business had possibilities of expansion; (7) that because of technological advances in the manufacturing and packaging processes, greater efficiency would be made available; (8) that the marcaroni business in general was growing throughout the United States; (9) that the firm had an efficient management; (10) that the firm had an efficient and stable sales force; (11) that the 30.66% interest was of special interest to the Robilio family; (12) that Colonel Cuneo's relationship and influence was with the distributors whom he had appointed and was not in connection with the large chains which had represented a steadily increasing portion of the firm's sales; (13) the strength of the firm's competitive position in the macaroni industry; (14) the strength and continuity of the management of the company; (15) the strength and continuity of the production force of the company; (16) the potential earning future of the business; (17) the fact that since 1952 the trend in selling the products of the firm had been from distributorship to direct selling; (18) that the largest purchasing customers of the firm were the chains and co-ops who were not influenced by salesmanship but purchased by means of customer demand; (19) that as of 1959, and for a few years preceding it, none of the larger customers ever saw Colonel Cuneo or even knew him; (20) that Albert Robilio had an awareness of the technical improvements in production methods and was planning to use the bulk flour technique and rapid speed packaging for the new plant.

by an all-inclusive definition. Bogert, Trusts and Trustees § 481 (2d ed. 1965).

Analogously, the same principles demand that the standard of good faith remain flexible. It cannot be said that the surviving partner, regardless of the circumstances, is to be held to an unbending procedure in discharging his fiduciary obligation. Equity predicates the fiduciary duty upon the assumption that the surviving partner will have a superior knowledge of the business and that the estate will be dependent upon him to receive fair treatment. Tennant v. Dunlop, 97 Va. 234, 33 S.E. 620 (1899). Thus, the surviving partner's conduct must be judged within the context of the knowledge and experience of the person with whom he deals. Cardoner v. Day, 253 F. 572 (D. Idaho 1918).

▇▇▇ Nevertheless, the leading cases reveal that certain conduct will violate the fiduciary duty as a matter of law. All of the authorities agree that the surviving partner may neither misrepresent nor conceal material facts. See Note, Fiduciary Duties of Partners, 48 Iowa L.Rev. 902 (1963). Concealment, in this sense, is not limited to active concealment. The duty may be breached by silence. Stark v. Reingold, 18 N.J. 251, 113 A.2d 679 (1955). Most of the courts, however, phrase this proposition in terms of "disclosure." For example, in perhaps the leading case in this area, the Supreme Judicial Court of Massachusetts held in Malden Trust Co. v. Brooks, 291 Mass. 273, 197 N.E. 100, 106 (1935), that the surviving partner has a duty to:

"* * * *disclose* voluntarily all within his possession or knowledge *from which a sound judgment* as to the value" of the share of the deceased partner in the partnership property and his claims against the partnership might be found. [Emphasis supplied.]

Similarly, the Supreme Court of Virginia stated in Tennant v. Dunlop, 97 Va. 234, 33 S.E. 620 (1899), that:

[H]aving generally a superior knowledge of the assets and their value, it is his bounden duty, in purchasing the interest of the deceased partner, to acquaint his representative with full information as to the assets, and the facts from which their value may be estimated or inferred. It is not sufficient that he does not withhold or conceal such information, but it is incumbent upon him to disclose voluntarily all within his possession or knowledge from which a sound judgment as to the value of the interest may be formed.

Plaintiff's interpretation of these, and similar cases, forms the basis of her charge that the Robilios violated their fiduciary duty. At the trial plaintiff established that Albert Robilio failed to mention numerous matters. Without listing them separately again, these matters which plaintiff alleges that the Robilios failed to disclose relate to: (1) good will; (2) consumer acceptance and demand; (3) possible growth of the firm; (4) the quality of personnel; (5) the potential earning future of the business; and (6) trends in the macaroni industry.

▇▇▇ The Court is of the opinion that plaintiff has misinterpreted the aforementioned cases and has overlooked others of significance. The requirement of disclosure is to insure that the surviving partner takes no advantage of the estate through superior knowledge. If the surviving partner could reasonably assume that the estate already has knowledge of a material fact, his silence does not constitute a breach of good faith. See Cardoner v. Day, 253 F. 572, 580 (D. Idaho 1918). The matters of good will, consumer acceptance and demand, and the quality of personnel were of this nature. Good will is an ordinary concomitant of any successful business, White Tower System v. White Castle System, Inc., 90 F.2d 67 (6th Cir. 1937), and any banker would be expected to know this fact. With respect to consumer acceptance and demand, Hebert testified that he was aware of this fact from examining the financial reports. Likewise, the financial reports provide

the most dependable information concerning the quality of the sales force and management. The volume of sales reflects the strength of the sales force and the margins of profit are indicative of management efficiency. Of course, neither of these statistics measures the specific individuals who compose management and the sales force. In some situations, good faith may require comment upon the individuals. For example, if the surviving partner were *selling* his interest to the estate and he knew that an important member of the sales or management team was about to die or resign, the information would probably be material and good faith would require disclosure. This is because one assumes good management and sales personnel from favorable statistics on the balance sheet. In the instant case, the financial reports would lead the skilled analyst to believe that sales and management were capable. Hence, there was no breach of faith on the part of Robilio in failing to divulge more information in this regard. There is no evidence that the plaintiffs were misled.

There is no doubt that certain matters which the plaintiff alleges were not disclosed could not be derived from an inspection of the financial reports of Cuneo & Robilio. Broadly, these matters pertain to the possible growth of the firm, the potential earning future of the firm, and the trends in the macaroni industry. If asked, Albert Robilio probably could have ventured an opinion as to each of these. Plaintiff seems to contend that he was required to volunteer an opinion as a matter of law. However, the Court holds that the failure to express an opinion on these matters did not breach the fiduciary duty. The only case of which the Court is aware specifically directing itself to this question contains the following language:

> He [the surviving partner] was not required to express himself relative to matters merely of speculation or surmise, but in so far as he chose to to give an opinion he was bound to act honestly and in good faith.

Cardoner v. Day, supra, at 577. Nevertheless, the Court is not prepared to accept the language of *Cardoner* without qualification. Under some circumstances an opinion from the surviving partner may be called for. If the matter has a significant bearing on the value of the partnership interest, and if the personal representative of the estate is unable to form an opinion from available information, good faith may demand that the surviving partner express himself. In *Cardoner*, the plaintiff was the personal representative of her deceased husband's estate. The defendant, one of the surviving partners, purchased the interest from her. The court reasoned that no opinion was required because:

> The plaintiff was not an ignorant, unsophisticated woman, nor was she without knowledge of the mining business. * * * She is fairly well educated. * * * In short, I would think that in any ordinary business transaction she could not easily be deceived or overreached.

*Cardoner* at 577. Other courts, in considering the scope of disclosure required to discharge the duty of good faith, have conditioned it upon the knowledgability of the personal representative or his advisors. The Massachusetts Court, in Malden Trust Co. v. Brooks, 291 Mass. 273, 197 N.E. 100, 108 (1935), stated what it called the general rule in these words:

> [W]here * * * there is independent representation of the beneficial interest, if a transaction between fiduciary and beneficiary "is fair and open and no advantage is taken, it will be upheld."

See O'Brien v. O'Brien, 294 Ky. 793, 172 S.W.2d 595, (1942); Shepherd v. Darling, 120 Va. 586, 91 S.E. 737 (1917). See also Turner v. Leathers, 191 Tenn. 292, 232 S.W.2d 269 (1950).

In the present case, assuming that the matters which were allegedly not disclosed by Albert Robilio were material, no breach of faith has been shown. The estate was not represented by an ignorant widow. Rather, the executor

of Cuneo's estate was the Union Planters National Bank of Memphis. The person with responsibility for the sale, Hebert, was a vice president and trust officer. Testimony at the trial established that he was experienced in the management and sale of trust property. Moreover, the Union Planters National Bank had been the recipient of Robilio & Cuneo's banking business for over thirty years. From the resources at the Bank's dis-· posal, the Robilio defendants were entitled to act on the assumption that the bank was well versed with respect to all material aspects of the partnership business.

 Nevertheless, disclosure alone does not satisfy the fiduciary duty. The most exacting disclosure would not suffice if the price paid were grossly inadequate. On the other hand, mere inadequacy of price does not constitute a breach of duty. Townes v. Townes, 270 F. 744 (5th Cir. 1921). And, by the same token, even though the price paid is fair, a breach of the fiduciary duty may be found. Brooks v. Martin, 69 U.S. (Wall.) 70, 17 L.Ed. 732 (1864). The fairness of the purchase price is one of the factors to be considered in determining whether the fiduciary duty was discharged. Malden Trust Co. v. Brooks, 291 Mass. 273, 197 N.E. 100 (1935).

Plaintiff has alleged that the actual value of the 30.66% interest was $750,-000, and that the price paid by the Robilios was grossly inadequate. The Court agrees that, if the value of the partnership share were $750,000, the price actually paid would have been grossly inadequate and would be conclusive evidence of lack of good faith. For this reason, some inquiry must be made into the fair value of the 30.66% interest.

 "Value" for the purposes of this case, is that price which a willing buyer would pay a willing seller. A fair price is reasonably near the actual value of the property. Furthermore, the fair value of the property must be determined under the conditions which existed at the time of the sale. Although plaintiff has made much of the admittedly profitable years which followed the sale of the partnership interest, the established rule is that hindsight appraisals are unacceptable. 1 Bonbright, Valuation of Property 84 (1937); O'Brien v. O'Brien, 294 Ky. 793, 172 S.W.2d 595 (1942). Cf. In re Fulton Trust Co., 257 N.Y. 132, 177 N.E. 397, 77 A.L.R. 499 (1931).

 In considering the question of value, the Court has been aided by the reports and testimony of the expert witnesses. The plaintiff called Dr. John Corson, of McKinsey & Co., Inc., and the defendants called Mr. William G. Hoskins, of Hoskins Co., and Robert Emmett, of Standard Research Consultants Inc. Each of these three experts used the capitalization method of valuation which entails the following six basic steps:

1. Forecast the annual sales of the company.
2. Estimate the prospective annual earnings of the firm.
3. Adjust these annual earnings by deducting reasonable executive salaries.
4. Convert the partnership earnings into corporate after-tax earnings by deducting corporate income taxes.
5. Multiply the corporate earnings by the appropriate price-earnings multiple.
6. Multiply the value of the entire firm by 30.66% to obtain the value of the partnership share.

Upon applying the capitalization method and making other adjustments to reflect the value of the particular firm, the appraisals were as follows:

| | Value of the Entire Firm | Value of 30.66% |
|---|---|---|
| Corson | $1,781,000–1,944,000 | $712,000–778,000 |
| Hoskins | $ 606,000 | $186,000 |
| Emmett | $ 950,000 | $247,000. |

An examination of the foregoing figures shows that Hoskins' appraisal is below the book value of the firm. Such a value strikes the Court as being patently unreasonable. Therefore, this discussion will hereinafter be limited to an analysis of the valuations of Corson and Emmett.

Both experts have forecasted prospective annual earnings of between $225,000 and $230,000, and after-tax corporate earnings of around $110,000. Hence, through the first four steps of the capitalization method, there is no divergence of opinion and the Court will accept these figures. However, considerable disagreement arises over the proper multiple to be applied to the earnings.

■ The capitalization method of valuation is based on the theory that the present value of a business is a capitalized value of its prospective earnings. Of course, the prospective earnings of a firm is only an estimate derived, primarily, from historical earnings. Hence, adjustments must be made for the possibility that these earnings will not be realized for one reason or another. This compensation for uncertainty is reflected in the capitalization rate. The capitalization rate is another term for the rate of return or interest rate. As may be expected, the rate of return is dependent upon the risk involved in realizing the anticipated income. If one were attempting to value a corporation whose stock is traded on a stock exchange, a bench mark is the rate which investors are presently demanding in their purchase of the corporation's stock. However, this rate would be expressed in terms of a price-earnings multiple rather than a capitalization rate. Unfortunately for the purposes of valuation, the partnership in this controversy provides no such convenient indicia. Therefore, the next best evidence of value is the price-earnings multiples of corporations whose stock is traded and are comparable to the firm of Robilio & Cuneo. Both Dr. Corson and Mr. Emmett relied on this method.

Dr. Corson explained that he reached the multiples of between 14.5 and 16 after considering six basic factors bearing upon the possible success of the business.[3] From these factors and the prospective earnings, Corson stated that he would advise a client to try to buy the enterprise at a return that would yield from 6% to 7%. Corson then confirmed his judgment by comparing the price-earnings ratios of food companies from Standard & Poor's Index. This survey was compiled by selecting companies within each industry and averaging their price-earnings ratios. These industries and their ratios were:

| Packaged Foods | 16.5 |
| Flour Milling | 18.0 |
| Bread Baking | 15.4 |
| Specialty Bakers | 15.7 |
| Breakfast Cereals | 17.0 |
| Canners | 12.1 |
| Corn Products | 15.0 |

Included in this survey were such companies as General Foods, Ralston-Purina, General Mills, H. J. Heinz, and Stokely-Van Camp.

In Mr. Emmett's opinion, the appropriate multiple was 8.5 or a rate of return of 12%. He appears to have relied more on the comparative method than did Corson. This comparison involved four firms which, according to Emmett, were the most comparable that he could find listed on the stock exchanges. These firms and their price-earnings ratios averaged over the preceding five years were:

| Catelli Food Products, Ltd. | 10.9 |
| Grocery Store Products Co. | 8.9 |
| Fearn Foods, Inc. | 8.4 |
| Stange (Wm. J.) Co. | 7.6 |

Emmett's report stated that he considered the history of Robilio & Cuneo, a

---

3. These factors were: (1) the macaroni industry was growing; (2) Robilio & Cuneo had a sound competitive position within the industry; (3) Robilio & Cuneo had experienced a steady growth in sales; (4) the firm had demonstrated an ability to market its products; (5) the firm had demonstrated an ability to produce a product at satisfactory costs; (6) the firm had capable management.

financial analysis of the firm, general business conditions, and the macaroni industry along with the price-earnings multiples for comparable companies in reaching his initial multiplier. He then adjusted this initial multiplier downward to 8.5 in order to reflect the uncertainties which existed at the time of valuation due to the death of Cuneo and the Federal Trade Commission's investigation of the firm.

The capitalization rate is the most important factor in the capitalization method of valuation. Thus, it would seem that both Corson and Emmett would have explained in detail the calculations involved in reaching their rates of 6–7% and 12%, respectively. However, neither gave numerical weight to each factor which he thought influenced the rate of return. Beyond sheer opinion, the best evidence presented to the Court was composed of the price-earnings ratios of the companies compared to Robilio & Cuneo.

The comparative-appraisal method demands that the selected companies be as truly comparable as possible. Every effort should be made to select companies of the same industry, size, and degree of risk. Goode, Valuation by Capitalization of Earnings (1939). Corson's companies are lacking in all three respects. First, the firms are not all members of the macaroni industry. Second, the sales of Robilio & Cuneo do not approach those of the companies used by Corson. Third, a firm which is a giant in its field, such as General Foods, is going to entail less risk than is a small concern such as Robilio & Cuneo.

Emmett selected four companies which were comparable in size. However, only two of these, Catelli Food Products, Ltd., and Grocery Store Products Co., were of the same size *and* industry. Apparently, though, Emmett used only Grocery Store Products Co. as the standard from which to make his downward adjustments for the death of Cuneo and the possibility of Federal Trade Commission sanctions against the firm. Ideally, the base of comparative companies should be broad. Central Trust Co. v. United States, 305 F.2d 393 (Ct. of Cl. 1962). The price-earnings average of these companies would compensate for individual peculiarities which make each firm more or less of a risk than the average company. The multiple which is attained by averaging will provide an accurate standard from which to make adjustments for the firm which is being valued. Thus, it is difficult to understand how Emmett could accurately adjust the multiple downward for Robilio & Cuneo without assuming that Grocery Store Products Co. entailed no unusual risks. Nevertheless, although Emmett has not convinced the Court that his adjustments are valid, his choice of comparatives and his analysis of those companies are sound. From the data presented and from the entire evidence, the Court concludes that the proper multiple for the firm of Robilio & Cuneo is approximately 10.

The second major departure in the opinions of Corson and Emmett is the inclusion by Corson of "excess capital" of $200,000 in the value of the entire firm. His multiples gave a value for the entire firm of between $1,581,000 and $1,744,000. The $200,000 was added to these figures. Excess working capital consists of current assets which are not needed in the conduct of the business. Corson concluded that the working capital was excessive in comparison with the average ratios of the packaged foods industry. These averages ranged from 2.4:1 to 4.4:1 as opposed to Robilio & Cuneo's current ratio of 6.6:1. However, as defendants point out, the liquid assets were held for construction of a new plant to replace the one which had been condemned. Working capital is not excessive if it is held in reserve to meet reasonable contingencies. Kent, Corporate Financial Management (1964). The new plant was built, and by the end of 1962 the current ratio had decreased to 1.51:1. From the record, it appears that the amount of current assets was reasonable.

Finally, in finding the value of the 30.66% interest, both Corson and

Emmett made adjustments for the sale of a part of the entire concern. However, Corson added a premium of 10% to the 30.66% because the purchase gave the Robilio family "control" of the company. Emmett applied a discount factor of 15% because of the flotation cost of marketing the interest that a corporation would entail. Despite the fact that both expert witnesses think some adjustment should be made, the Court does not feel that either is warranted. The capitalization of earnings valuation method does not require an analogy to the corporate entity. See 1 Bonbright, Valuation of Property 216–266 (1937). A rate of return can be computed for other business associations. The conversion to corporate earnings has been used, and has been accepted by the Court, because the comparative method of choosing a multiplier was deemed the most accurate means of setting a value for the entire firm. Once the proper multiple is selected, the reason to consider the partnership as a corporation no longer exists. In computing the fair value of the 30.66% share, there is no reason to add a premium of 10% for control. Unless otherwise provided in the partnership agreement, all partners have equal rights in the conduct and management of the firm's business affairs. 61 Tenn.Code Ann. § 117 (1955). Thus, the Robilio family does not have control simply because the purchase of the interest would give them 80% ownership. Therefore, the 30.66% interest is worth no more than the expected income to which the share will entitle them. And, with respect to Emmett, it is equally apparent, since securities are not being floated, that no discount should be taken to allow for floatation cost.

■ With respect to the valuation issue, the Court has reached the following conclusions after considering the testimony of the expert witnesses: (1) for purposes of capitalization, the after-tax earnings should be set at $110,000; (2) the proper multiple is approximately 10; (3) neither Corson's premium for control nor Emmett's discount for flotation should be allowed. These conclusions and the other evidence presented establish that the actual value of the partnership interest was in the range of $300,000 to $340,000. The price actually paid, $317,000, being within these figures, must be considered a fair price. Consequently, the plaintiff's allegation that the purchase price was grossly inadequate is without merit.

Having found that the Robilios conducted themselves with good faith during the negotiations and paid a fair price for the interest of the deceased partner, the Court finds that there was no breach of fiduciary duty by the surviving partners, a finding which is dispositive of the first cause of action.

■■ The second cause of action does not require an extended discussion. The plaintiff seeks to rescind and cancel the partnership agreement between Mrs. Cuneo and the Robilio defendants. However, the evidence does not sustain a finding that the Robilios breached their fiduciary duty in executing the partnership agreement with Mrs. Cuneo. First, the testimony at the trial established that Mrs. Cuneo was mentally competent and was represented by counsel. Second, with respect to the class of persons to whom Mrs. Cuneo's interest could be conveyed, the plaintiff has shown no more than that the Robilios were attempting to protect themselves from being burdened by an unwanted partner. Third, the provisions for the purchase of a departing partner's interest are not unfair. The purpose of the partnership agreement was to set out the rights and duties of the partners in order to avoid disputes that could have been reconciled at the inception of the partnership. None of the provisions in the partnership agreement was unreasonable or unfair to Mrs. Cuneo, and the Court finds no breach of fiduciary duty to support the second cause of action.

In light of the disposition of the foregoing issues, the affirmative defenses and plaintiff's responses thereto are no longer relevant to the decision in this case. Consequently, the Court will not

burden this opinion with their treatment.

In summary, upon consideration of the entire record the Court has concluded that the defendants did not breach their fiduciary duty in either their dealings with the estate or with Mrs. Zadie S. Cuneo. The Court has found that the Robilios did not conceal material facts and that sufficient affirmative disclosures were made to show good faith by the defendants. Furthermore, an inquiry into the value of the 30.66% partnership share has revealed that the $317,000 actually paid to the estate was at the time of the sale a fair price. With respect to the partnership agreement, the Court is of the opinion that the terms were reasonable and that the overall transaction was fair.

Inasmuch as the Court finds no basis upon which the relief requested in the complaint could be granted, a form of judgment will be submitted dismissing the complaint and denying the relief sought.